|188:38 LRA 855|

THE PEOPLE ex rel. M. T. Moloney, Attorney General,

v.

CHARLES S. KIRK et al. Commissioners of Lincoln Park.

*Filed at Springfield June 11, 1896.*

1. WATERS—*State holds title to submerged lands in trust.* The State of Illinois holds title to the submerged lands of Lake Michigan lying within its boundaries in trust for the people of the entire State for the purposes of navigation and fishery, but the governmental power of the State over such lands cannot be relinquished.

2. SAME—*how far legislature may authorize extension of driveway over waters.* The legislature has power, by the act of 1889, (Laws of 1889, p. 212,) to authorize a park board to extend a driveway over and upon the waters of Lake Michigan, so long as the same does not interfere with navigation, commerce or the right of fishery.

3. SAME—*power of legislature to appropriate submerged lands.* Submerged lands redeemed by the extension of a driveway upon Lake Michigan, in pursuance of the act of 1889, may be appropriated by the park board, under authority of the act of 1889, to paying for the improvement.

4. SAME—*general powers of the legislature over waters of lakes.* The legislature of Illinois, representing not only the State, which holds the title, but also the people, for whose use the title is held, possesses the sovereign power of parliament over the waters of lakes and the submerged lands covered by the same.

5. COMMON LAW—*does not restrict power of legislature.* The common law exists in Illinois by virtue of a statute, and the powers of the legislature are in no manner limited or restricted thereby.

6. CONSTITUTIONAL LAW—*general powers of legislature—restrictions.* The General Assembly in this State is clothed with all powers of legislation not denied to it by the constitution of the State or of the United States, but cannot part with governmental power.

7. SAME—*what is a sufficient expression of the subject of statute in title.* An act "to enable park commissioners having control of any driveway upon public waters to extend the same," is not void for failure to express in its title the further power granted to appropriate the submerged lands to defray the cost of the improvement, this being germane to the main purpose expressed.

8. PARKS—*construction of power conferred by act of 1889.* The act of 1889, (Laws of 1889, p. 212,) giving power to park boards to appropriate submerged lands to the defraying of the cost of driveways extended over lakes, and to that end "to sell and convey such submerged lands," authorizes a board to convey such lands directly to shore owners in payment for the construction of a driveway, provided the board thereby receive their full value; and they are not bound to sell such lands for cash.

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

This was an information brought by the Attorney General against the commissioners of Lincoln Park and the owners of the land adjacent to the shore of Lake Michigan, between Ohio street and Oak street, in the city of Chicago, for the purpose of canceling certain contracts entered into between said park commissioners and said property owners for the extension of the lake shore drive from Oak street to Ohio street, entered into under an act

of the legislature of the State of Illinois passed in the year 1889, and for the purpose of having removed the filling, breakwaters and extension of the drive already made under said contracts. The contracts in question bear date the 22d day of June, 1891, and provide for the completion of the work called for by the contracts during the year 1893.

At the date of the passage of the act of the legislature in question, in the year 1889, a drive had already been constructed by the park commissioners from the south line of Lincoln Park, at North avenue, to Oak street, over the bed of Lake Michigan a short distance from the shore, and the shore owners had filled out and improved their property to the inner edge of said lake shore drive. In like manner Lincoln Park had been enlarged by the extension of the lake shore drive north from North avenue over the waters of Lake Michigan, and the filling in of the submerged lands lying between such drive and the original lake shore, excepting such portions thereof as were set apart for a basin to be used by boats. It was provided by the act as follows:

"Sec. 1. That every board of park commissioners existing under the laws of this State, that now has or may hereafter have control over any boulevard or driveway connecting with any public park under the control of such board, and bordering upon any public waters in this State, shall have power, subject to the limitations in this act contained, to extend such boulevard or driveway, of the width of not more than two hundred feet, over and upon the bed of such public waters: *Provided, however,* that no such boulevard or driveway shall be extended, under the provisions of this act, in such a manner as to interfere with the navigation of such public waters for the purposes of commerce, and that the lands adjacent to such public waters and connected with the termini of such boulevard or driveway, as extended under the provisions of this act, shall lie within the district or territory

the property of· which shall be taxable for the mainte-
nance of the parks under the control of such board.

"Sec. 2. Whenever such board of park commissioners
shall determine to extend any such boulevard or drive-
way under this act, said board shall prepare a plan of
such proposed extension, and make an estimate of the
cost thereof, and shall obtain the consent, in writing, of
the owners of at least two-thirds of the frontage of all the
lands not appropriated to or held for public use abutting
on such public waters, in front of which it is proposed to
extend such boulevàrd or driveway, for the making of
such extension, and shall also obtain the consent of the
supervisor and assessor, corporate authorities of the town
or towns in which the lands abutting upon such public
waters in front of such proposed extension may lie, to the
making of such extension.   The riparian or other rights
of the owners of lands on the shore adjoining the waters
in which it is proposed to construct such extension, the
said board of park commissioners may acquire by contract
with or deeds from any such owner; and in case of inabil-
ity to agree with any such owner, proceedings·may be
had.to condemn such rights, according to the provisions
of article 9 of an act entitled 'An act to provide for the
incorporation of cities and villages,' approved April 10,
1872, and the amendments thereof.

"Sec. 3. Upon complying with section 2 of this act
said board shall have power to contract, in writing, with
any person or persons for the construction of such exten-
sion of such boulevard or driveway, according to such
plan and under the supervision of said board; and in all
cases where any boulevard or driveway is extended under
the provisions hereof, the submerged lands lying between
the shore of such public waters and the inner line of the
extension of such boulevard or driveway shall be appro-
priated by the board of park commissioners to the pur-
pose of defraying the cost of such extension, and to that
end such board of park commissioners are authorized to

sell and convey such submerged lands in fee simple, by deeds duly executed on its behalf by its president and under its corporate seal, and every deed executed in pursuance hereof shall vest a good title in the grantee to the premises intended to be conveyed thereby.

"Sec. 4. Upon the completion of any such extension of such boulevard or driveway, the title thereto and to the bed thereof shall be vested in such board of park commissioners for the purpose of a boulevard or driveway and shall become a part of the public park or parks under the control of such board, and shall thenceforth be maintained and controlled by such board in the manner provided by law for the government and maintenance of other boulevards and driveways under its control."

Under this act of the legislature the board of commissioners of Lincoln Park located its boulevard or driveway over and upon Lake Michigan in such a manner that ninety-three acres of submerged land lying between the shore and the western boundary of the driveway was reclaimed. This large tract of reclaimed land was, under the provisions of the act, sold by the board of commissioners to the shore owners, each shore owner obtaining that portion of the reclaimed land lying opposite the tract of land by him owned. In consideration of the sale of these lands the shore owners agreed to construct the driveway in the lake and fill in the submerged lands between the driveway and the shore, except the commissioners agreed to build so much of the driveway as should lie north of the center line of Oak street extended, and to have the same completed by the first day of May, 1893; also to build the boulevard or driveway between the center line of Pierson street and the center line of Chicago avenue. In addition to the work agreed to be done by the shore owners, they also agreed to pay the commissioners $100 per lineal foot of their respective frontages on Lake Michigan. The following plat put in evidence

on the trial shows the location of the boulevard and the lands lying east of Pine street made by its construction:

MAURICE T. MOLONEY, Attorney General, (T. J. SCO-FIELD and M. L. NEWELL, of counsel,) for appellant:

At common law a grant of land bounded by the sea or by navigable tide-water did not pass the title below high-water mark.   Hargrave's Law Tracts, 17, 18, 27.

"Where the soil is the king's the building below the high-water mark is a purpresture,—an encroachment and intrusion upon the king's soil,—which he may either de-

molish or seize or rent at his pleasure; but it is not *ipso facto* a common nuisance, unless, indeed, it be a damage to the port and navigation." Mitford's Pl. (4th ed.) 145; *Blundell* v. *Catterall*, 5 B. & A. 268; *Attorney General* v. *Richards*, 2 Anstr. 603 ; *Attorney General* v. *Parmeter*, 10 Price, 378; *Attorney General* v. *Terry*, L. R. 9 Ch. 425 ; *Barney* v. *Keokuk*, 94 U. S. 324; *Weber* v. *Harbor Comrs.* 18 Wall. 57.

As governing the rights of proprietors owning lands on public navigable streams in this State, and as to the rights of the State therein, and the public to the navigation, trade and fishing therein, this court has applied the law as it existed in Great Britain. *Middleton* v. *Pritchard*, 3 Scam. 510; *People* v. *St. Louis*, 5 Gilm. 368; *Ensminger* v. *People ex rel.* 47 Ill. 388 ; *Chicago* v. *Laflin*, 49 id. 173 ; *Lovingston* v. *St. Clair County*, 64 id. 56 ; *Chicago* v. *McGinn*, 51 id. 272; *Braxon* v. *Bressler*, 64 id. 490; *Railway Co.* v. *Stein*, 75 id. 44; *Houck* v. *Yates*, 82 id. 181; *Cobb* v. *Lavalle*, 89 id. 334; *Washington Ice Co.* v. *Shortall*, 101 id. 52; *Trustees* v. *Schroll*, 120 id. 509.

The constitution provides that every act shall embrace but one subject, and that shall be expressed in its title,—and the subject of this act is not expressed in its title. *People* v. *Nelson*, 133 Ill. 574 ; Const. sec. 13, art. 4; *Fuller* v. *People*, 92 Ill. 182 ; *Timm* v. *Harrison*, 109 id. 593 ; *Leach* v. *People ex rel.* 122 id. 440; *Donnersberger* v. *Prendergast*, 128 id. 229; *Dolese* v. *Pierce*, 124 id. 140; *Cohn* v. *People*, 149 id. 486.

LOUIS M. GREELEY, also for appellant:

It has uniformly been held that a power to sell and convey property given to an agent vests him only with authority to sell for cash. Under such authority he may not sell on time, (*Whipple* v. *Pope*, 33 Ill. 334 ; *School District* v. *Insurance Co.* 62 Me. 330;) much less exchange or sell for a consideration other than money. *Hampton* v. *Moorhead*, 62 Iowa, 91; *Taylor* v. *Starkey*, 59 N. H. 142; *Trudo* v. *Anderson*, 10 Mich. 357 ; *Morrill* v. *Cone*, 21 How. 75 ; *Co-*

*lumbus I. & B. Co.* v. *Humphries*, 64 Miss. 258; Mechem on Agency, secs. 325, 326.

The above rules apply with redoubled force where the agent is a municipal corporation or a public officer, and the property to be disposed of is public property.    Mechem on Public Officers, sec. 511; *School District* v. *Insurance Co.* 62 Me. 330; 1 Dillon on Mun. Corp. (4th ed.) secs. 89, 91.

Any fair, reasonable doubt concerning the existence of a power is resolved against the corporation, and the power is denied.    1 Dillon on Mun. Corp. secs. 89, 91; Mechem on Public Officers, sec. 511; *School District* v. *Insurance Co.* 62 Me. 330.

HERRICK, ALLEN & BOYESEN, for appellees the Newberry Library and Nathaniel K. Fairbank.

EDWARD O. BROWN, for appellees the Commissioners of Lincoln Park. `

MARSTON, AUGUR & TUTTLE, for appellee Arthur L. Farwell.

WILSON, MOORE & MCILVAINE, for appellees Andrew H. Green *et al.* Trustees.

GEO. W. SMITH, for appellees Charles Fitz Simons *et al.*

Mr. JUSTICE CRAIG delivered the opinion of the court:

The first ground relied upon by the People to reverse the judgment of the circuit court has been subdivided in the argument into the three following propositions: First, that the legislature of the State of Illinois has no power to alienate the submerged lands of Lake Michigan, as proposed by the act of June 4, 1889; second, that Lake Michigan and its submerged lands (subject to the paramount right of the general government under the commerce clause of the constitution of the United States) can only be disposed of by the State of Illinois in aid of trade, commerce and the free navigation of the same;

third, the people of the State having a common right of piscary over all the waters of the lake, the State cannot alienate the submerged lands, or any part thereof, so as to destroy such right of piscary.

The law seems to be well settled in the different States that the title to and dominion over lands covered by tide-waters within the boundaries of the several States belong to each State wherein they are located. The State holds the fee in trust for the public. The doctrine established in regard to lands covered by tide-waters has also been held applicable to lands bounded by fresh water on our large lakes. As early as 1860 the question arose in this State in regard to the proper construction to be placed on a deed conveying lands with Lake Michigan as a boundary line, and in disposing of the question this court, in *Seaman* v. *Smith*, 24 Ill. 521, held that a grant giving the ocean or a bay as the boundary line, by the common law carries it down to the ordinary high-water mark; that the point at which the tide usually ebbs and flows is the boundary of a grant to the shore, and that the rule which governed in regard to lands on tide-water applied to lands on our large lakes. It is there said (p. 525): "A fair and reasonable construction of the language 'running to the lake and with the lake,' would mean to that place where its outer edge is usually found. * * * We are therefore clearly of the opinion that the line at which the water usually stands when free from disturbing causes is the boundary of land in a conveyance calling for the lake as a line."

Aside from the fact that the waters of our large lakes are fresh and there is no ebb and flow of the tide, they do not differ materially from the open sea, and no reason is perceived why one rule should be applied to lands bounded by the sea and a different rule applied to lands bordering on our great lakes. Where a navigable river is called for as a boundary line the grantee will take to the thread of the current of the stream. But the rule that

governs our rivers has no application to our great lakes. The Supreme Court of the United States, in *Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 387, announces the same doctrine laid down by this court. It is there said: "We hold that the same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the great lakes applies which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide-waters on the borders of the sea, and that the lands are held by the same right in the one case as in the other and subject to the same trusts and limitations." It is true that the State holding the title to the lands covered by the waters of Lake Michigan does not hold such title subject to barter and sale, as does the United States its public lands; but the State holds the title in trust, in its sovereign capacity, for the people of the entire State, for the purposes of navigation and fishery. The governmental powers of the State over these lands cannot be relinquished or given away. The trust imposed upon the State must be kept and faithfully observed.

But did the State repudiate the trust and transcend its powers on the enactment of the act of June 4, 1889, which authorized the board of park commissioners to extend its boulevard or driveway over and upon the bed of Lake Michigan, and sell and convey the submerged lands which might be reclaimed in extending the driveway in the lake? The extension authorized, as construed by the board of park commissioners in making the improvement, is not a matter of small moment, but, on the other hand, owing to the large amount of territory involved and the large interests of the public in the waters of the lake and property owners on the lake, the proposed extension is so far-reaching in its effect as to present questions of great importance. The distances of the outer breakwater from the shore line of the lake as it existed in 1888 are as follow: At the south line of Oak street 1340 feet; at the

north line of Pierson street 1250 feet; at the center of Chicago avenue 1370 feet; at the north line of Ohio street 1330 feet; at the north line of Indiana street 850 feet. The entire area reclaimed or to be reclaimed, from Oak street to Indiana street, taking the shore line of 1888 and the outer face of the breakwater as outer and inner boundaries, is 93.14 acres, of which 31 acres lie between the south line of Oak street and the north line of Pierson street, 10.44 acres between the north line of Pierson street and the center of Chicago avenue, and 51.70 acres between the center of Chicago avenue and the north line of Indiana street. This large tract of land, containing 93 acres, held by the State in trust for the people, is taken and transferred to the adjacent shore owners, to be by them used for such purpose as they may think best, for their own personal interest.

If the question of policy were one to be considered by the court in the decision of this case, we would have no hesitation in condemning the action of the legislature in passing the act as unwise and detrimental to the best interests of the people of the State. But our legislature is chosen by the people and clothed and entrusted with power to enact laws for the people, and the propriety or impropriety of legislation is a matter solely with the legislative department of the State, and unless an act passed by the legislature infringes upon some provision of our organic law it is not the province of the courts to declare such legislation invalid. The question before us is not one of policy or expediency, but one of power. Was the legislature clothed with power to convey reclaimed lands which were originally covered by the waters of Lake Michigan?

In *Illinois Central Railroad Co.* v. *Illinois, supra,* in speaking on this question of power, the court said: "The ownership of the navigable waters of the harbor, and of the lands under them, is a subject of public concern to the whole people of the State. The trust with which they

are held, therefore, is governmental, and cannot be alien-
ated, except in those instances mentioned of parcels used
in the improvement of the interest thus held, or when
parcels can be disposed of without detriment to the pub-
lic interest in the lands and waters remaining." In the
case cited the court recognizes the power of the State to
convey parcels of the lands held by the State under navi-
gable waters when such conveyance will not impair the
public interest in the lands and waters remaining.

In *Weber* v. *Harbor Comrs.* 18 Wall. 57, where the ques-
tion arose in regard to the conveyance of certain land
covered by the waters of the bay of San Francisco, the
court, among other things, said: "Upon the admission of
California into the Union upon equal footing with the
original States, absolute property in and dominion and
sovereignty over all soils under the tide-waters within
her limits passed to the State, with the consequent right
to dispose of the title to any part of said soils in such
manner as she might deem proper, subject only to the
paramount right of navigation over the waters, so far
as such navigation might be required by the necessities
of commerce with foreign nations or among the several
States, the regulation of which was vested in the general
government."

In *Hoboken* v. *Pennsylvania Railroad Co.* 104 U. S. 688,
the question arose in regard to the validity of an act of
the State of New Jersey, under which certain companies
paid the State a certain sum of money for the privilege
of filling up and reclaiming for their own use submerged
land under public waters of the State in front of lands
owned by said parties. The act of the legislature was
sustained, and the court, among other things, said: "In
the examination of the effect to be given to the riparian
laws of the State of New Jersey by the act of April 11,
1864, in connection with the supplementary act of March
31, 1869, it is to be borne in mind that the lands below
high-water mark, constituting the shores and submerged

lands of the navigable waters of the State, were, according to its laws, the property of the State as sovereign. Over these lands it had absolute and exclusive dominion, including the right to appropriate them to such uses as might best serve its views of the public interest, subject to the power conferred by the constitution upon Congress to regulate foreign and inter-State commerce."

In *Shively* v. *Bowlby*, 152 U. S. 9, the correctness of the rulings of the Supreme Court of Oregon arose. The rulings, as given in the report of the case, were as follows: "Second, the Supreme Court of Oregon decided that said State was the absolute owner of all rights in front of the high land granted by the United States to said grantee, with said Columbia river as a boundary, below the meander line, out to the channel of said Columbia river, to the exclusion of all rights of the grantee aforesaid of the United States under the said act of Congress of September 27, 1850. Third, the Supreme Court of Oregon decided that said State had the absolute power to dispose of the soil of said river, and of all wharfage rights in front of the high land granted by the United States to said grantee, the predecessor of the plaintiff in error, with the said Columbia river as a boundary, to a private person for a private beneficial use, and had so disposed of the same to the defendants in error." The court, after reviewing many decisions of different courts in regard to the control of the State over submerged lands, said: "The foregoing summary of the laws of the original States shows that there is no universal and uniform law upon the subject, but that each State has dealt with the lands under the tide-waters within its borders according to its own views of justice and policy, reserving its own control over such lands or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another."

In *Barney* v. *Keokuk*, 94 U. S. 324, the disposition of sub-
merged lands was held to be a question for the several
States to determine for themselves, and if they chose to
resign to the riparian proprietor rights which properly
belong to them it was not for others to object.

Under the authorities the law seems to be well settled
that the legislature was clothed with power to enact a
law authorizing the extension of the driveway over and
upon the waters of the lake, so long as the extension did
not interfere with navigation, commerce and the right
of fishery upon the lake, and we see no reason why the
submerged lands reclaimed by the extension of the drive-
way may not, as provided in the act, be appropriated for
the payment of the improvement.   The legislature rep-
resents not only the State, which holds the title which
at common law was vested in the crown, but the legis-
lature also represents the public, for whose benefit the
title is held, and in that capacity it possesses the sover-
eign power of parliament over the waters of the lake and
the submerged lands covered by the waters.   In provid-
ing for the construction of the drive over and upon the
shoal waters of the lake and placing the control in the
hands of the park commissioners for park purposes, no
attempt has been made by the legislature to relinquish
its governmental powers or place them beyond the power
of future legislation.   The rights of navigation and of
fishery remain substantially in the public as before.   If
these rights were taken away or materially infringed
upon by the act or the action of the commissioners under
the act, the action of the commissioners could not be sus-
tained, as the legislature has no power to dispose of the
waters of Lake Michigan, or the lands under the waters,
contrary to the trust under which they are held for the
people.

But it is said in argument that the king of Great Brit-
ain did not, at common law, have the power to dispose
of the title to lands covered by navigable waters, and

as the common law has been adopted in this State the legislature has no such power. The common law in this State owes its existence to an act of the legislature, and it is subject to alteration, modification or absolute repeal by the legislature at any time it may choose. The powers of the legislature are in no manner limited or restricted by the common law. The first section of the fourth article of our constitution confers the legislative power of the State on the General Assembly, and the General Assembly is clothed with all power of legislation in regard to all matters pertaining to the State, except so far as it is prohibited by the constitution of the State or of the United States. This question is discussed at considerable length in *Longdon* v. *New York City*, 93 N. Y. 155, where it is said: "From the earliest times in England the law has vested the title to and the control over the navigable waters therein in the crown and parliament. A distinction was taken between the mere ownership of the soil under water and the control over it for public purposes. The ownership of the soil, analogous to the ownership of dry land, was regarded as *jus privatum*, and was vested in the crown, but the right to use and control both the land and water was deemed a *jus publicum*, and was vested in parliament. The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by parliament. (*Commonwealth* v. *Alger*, 7 Cush. 53; *People* v. *N. Y. etc. Co.* 68 N. Y. 71.) * * * In this country each State, subject to limitations to be found in the Federal constitution, has the absolute control of all the navigable waters within its limits. As said by the chancellor in *Lansing* v. *Smith*, 4 Wend. 9, (21 Am. Dec. 89,) the State, through its legislature, 'may exercise the same powers which, previous to the Revolution, could have been exercised by the king alone, or by him in conjunction with parliament, subject

only to those restrictions which have been imposed by the constitutions of the State and the United States.'" See, also, *Clark* v. *City of Providence*, 16 R. I. 338, and *Mowry* v. *City of Providence*, id. 422, where the same doctrine is announced. In the latter case it is said: "In the case of *Clark* v. *City of Providence*, (*ante*, p. 337,) this court held the act to be constitutional. We held in that case that the State, or General Assembly as the organ of the State, is the representative of the public or people as to the public right, and as such has power to release the right, the General Assembly having in the matter the authority, not simply of the English crown, but of both crown and parliament, except so far as it has been limited by the constitution of the State or by the constitution and laws of the United States."

There is here no complaint on behalf of the Federal government, or of any of its officers, that the action of the legislature, and the extension of the driveway, in pursuance of the act, upon the waters of the lake, will in any manner interfere with commerce. The only complaint comes from the Attorney General, acting for and on behalf of the People. The People, however, have spoken through their representatives, who were clothed by them with full power to act. If the legislation is unwise or detrimental to the best interests of the State the people cannot complain, because they alone are to blame in selecting men to represent them who were unfit to discharge the duties with which they were clothed. The remedy is in the hands of the people by electing competent and honest men to represent them in the legislature. When the people have chosen their representatives, clothed with legislative power, they cannot complain of the action of their chosen representatives so long as the legislation does not conflict with the organic law of the State or of the United States, or so long as they do not undertake to part with governmental power.

But it is said, if the legislature has the power to dispose of the submerged lands in question under the pretense of constructing a boulevard two hundred feet wide, why could it not give away any indefinite quantity of the submerged lands of the lake? It is not claimed here that the legislature has the power to dispose of submerged lands of the lake in any case where the disposition would materially interfere with the navigation of the lake for the purposes of commerce and the right of fishery, and it may be conceded that such power is governmental and does not exist. Indeed, the first section of the act in question in direct terms prohibits an extension of the boulevard in such manner as to interfere with the navigation of the lake for the purpose of commerce. Upon looking into the evidence it will be found that the waters of the lake west of the driveway as constructed were not adapted to navigation and were not used to any great extent for that purpose. The learned judge before whom this case was tried, in speaking of the evidence on this branch of the case, said: "It is true that in some cases tugs, small craft for carrying passengers in a small way to and from the government breakwater and to other points near this drive along the lake, small sailing yachts and boats for pleasure, have, from time to time, passed over these waters, and that a very considerable portion of these waters were, before being filled, deep enough to be navigated by small vessels actually engaged in trade and commerce between the port of Chicago and other ports on the lake; but it is also a further fact, shown by the evidence, that all such small vessels are a very insignificant proportion of the whole number of vessels engaged in trade and commerce to and from the port of Chicago, and that these small vessels never have passed over these waters, because, in going to and from the harbor of Chicago, these waters are outside of the usual course, and are considered dangerous by sailors on the lake. Only a very small portion of all the vessels arriv-

ing at and departing from Chicago ever come within the
government breakwater off this shore, and when they do
they invariably pass quite near the breakwater, which
is about fifteen hundred feet easterly from the easterly
line of said proposed drive, in order to avoid shoal water."
From the foregoing it is apparent that the construction
of the boulevard authorized by the act will not materially
interfere with or obstruct the navigation of the lake.

But it is said the act is invalid because it conflicts
with that provision of the constitution which provides
that every act shall embrace but one subject, and that
shall be expressed in its title.   The title of the act is as
follows:  "An act to enable park commissioners having
control of any boulevard or driveway bordering upon any
public waters of this State, to extend the same."   Sec-
tion 1 provides for the extension of such driveway over
and upon the bed of such public waters.   Section 2 pro-
vides for an estimate of cost and the consent of a certain
amount of the frontage abutting on such waters.  Section 3
provides that the board may contract for the construction
of such extension, and that the submerged lands lying
between the shore and the inner line of such extension
shall be appropriated to the purpose of defraying the
cost of such extension, and to that end the board are
authorized to sell and convey such lands, etc.   Upon ex-
amination it will be found that the act has but one gen-
eral object, and that is fairly indicated by the title, and
under the rule laid down in *People* v. *Nelson*, 133 Ill. 565,
we do not regard it in conflict with the constitution.  The
act conferred power on the board of park commissioners
to extend a boulevard over and upon the waters of Lake
Michigan.   This was the main purpose of the act.   But
in order to facilitate the work it was proper to provide
means to defray the cost of the work in the same act.
In the prosecution of the work it was obvious that there
would be submerged lands between the boulevard as con-
structed and the former shore, and these lands were by

the act appropriated to defray the cost of the improvement. These provisions are, as we think, germane to the real purpose of the law as expressed in the title. See *Johnson* v. *People*, 83 Ill. 431; *Larned* v. *Tiernan*, 110 id. 173.

It is also claimed that the location of the boulevard is not an extension of the lake shore drive, within the meaning of the statute. The lake shore drive, as constructed by the Lincoln Park commissioners at the time the act of 1889 was passed by the legislature, commenced at North avenue and extended along Lake Michigan south to Oak street, where it connected with Pine street. Under an ordinance of the city of Chicago, Pine street, from Oak street south, had been turned over to the Lincoln Park commissioners as a boulevard. The extension of the boulevard as located by the commissioners of Lincoln Park leaves the old lake shore drive at its terminus at the south and extends east a certain distance, and then turns to the south-east, as shown by the map put in evidence. The argument is, that the boulevard as laid out is not an extension of the original lake shore drive because not joined to the end of such drive and does not run in the same direction as the old drive. The act of 1889 did not attempt to locate the extension of the driveway. It merely provided it should be over and upon Lake Michigan, thus leaving a large discretion in the hands of the commissioners, and in the exercise of the discretion vested in them there has been no such departure from the act as to render the action of the commissioners nugatory.

Section 3 of the act contains the following provision: "In all cases where any boulevard or driveway is extended under the provisions hereof, the submerged lands lying between the shore of such public waters and the inner line of the extension of such boulevard or driveway shall be appropriated by the board of park commissioners to the purpose of defraying the cost of such extension, and to that end such board of park commissioners are au-

thorized to sell and convey such submerged lands in fee simple, by deeds duly executed." Under this statute it is claimed that the park commissioners were only authorized to sell the submerged lands for cash, and that the contracts entered into by the park commissioners with the shore owners, under which the lands were to be conveyed to the shore owners upon the completion of the work called for by the contracts and upon the payment of $100 per foot, were not authorized by the statute. Under the statute *supra* the submerged lands lying between the shore of the lake and the inner line of the boulevard to be constructed were placed in the hands of the commissioners, to be used in payment of the cost of the improvement. If the park commissioners had sold the submerged lands to the shore owners for cash and used the money to defray the cost of the improvement it is not suggested that the statute would have been violated. If the work agreed to be performed by the shore owners was done as cheaply as if they had paid cash, and if the price given for the submerged lands was its full market value; in principle it made no difference whether or not the lands were sold for all cash or a part cash and a part in making the improvement. These submerged lands were set apart to be used in payment of the cost of the improvement, and until it has been shown that they have been disposed of in such a way that the commissioners have not received their full value on the improvement no one can properly object.

The right of a shore owner on Lake Michigan to fill up portions of the lake and thus extend his lands does not arise in this case and that question will not be considered.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*