**LAKE MICHIGAN FEDERATION, an Illinois not-for-profit corporation; Laurie Leigh, Larry Heinemann, Seymour Meier and Capt. Don Thayer, Jr., as individual Illinois taxpayers, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; Michael P.W. Stone, as Secretary of the Army; Henry T. Hatch, as Chief of Engineers; Jess J. Franco, as District Engineer, North Central Division, Corps of Engineers; and Loyola University of Chicago, a not-for-profit corporation, Defendants.**

No. 90 C 2809.

United States District Court,
N.D. Illinois, E.D.

June 22, 1990.

Supplemental Opinion on Denial of
Rehearing July 18, 1990.

Barry J. Freeman, Jeffrey P. Smith, Gottlieb & Schwartz, Chicago, Ill., for plaintiffs.

David Engel, Frederic J. Artwick, Sidley & Austin, Chicago, Ill., Gail Ginsberg, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The Lake Michigan Federation ("Federation") has filed this action for declaratory and injunctive relief against Loyola University of Chicago ("Loyola"), the United States Army Corps of Engineers, and various officials of the United States Army Corps of Engineers (collectively referred to as "the Corps"). The Federation seeks an injunction restraining Loyola from constructing a twenty acre lakefill on its Lake Shore campus in Chicago, Illinois. Because we find that the property to be used for this project was conveyed in violation of the public trust, we grant the Federation's motion for injunctive relief.[1]

---

1. The matter initially came before us when the Federation filed its motion for a temporary restraining order. At a hearing on June 4, 1990, we informed the parties that we would treat this motion as a motion for preliminary injunction, and directed them to submit briefs, affidavits, exhibits and similar materials. The parties represented that they did not wish to present testimony. On June 14, 1990, after reviewing the materials submitted, we informed the parties that, with their permission, we would treat the motion as a dispositive motion for permanent injunctive relief. Loyola and the Corps have raised one narrow objection to this conversion.

Loyola is a private educational institution organized as a not-for-profit corporation. Among Loyola's campuses in the Chicago area is its Lake Shore campus bordering Lake Michigan on the north side of the city. In 1988, Loyola decided to expand this campus. Loyola determined that it would not be feasible to expand onto adjacent land. Instead, it developed plans to construct a lakefill of approximately twenty acres in the waters of neighboring Lake Michigan. Because erosion had damaged the existing shoreline, Loyola viewed the lakefill both as a means for the expansion and protection of its campus.

The plans developed by Loyola called for a lakefill of about 18.5 acres. Along the perimeter of the lakefill, Loyola intended to construct a stone revetment, as well as bike and walking paths, a seawall, and lawn areas. The public would have unrestricted access to these areas, which comprise about 2.1 acres of lakefill.[2] In the interior portion of the lakefill, Loyola plans to build athletic facilities, including a running track, a women's softball field, and multi-purpose athletic fields. The public would have access to these areas, but subject to Loyola's right of ownership. In addition, Loyola proposed restoration and improvements to Hartigan Park Beach, which borders the proposed lakefill.

Loyola sought and received legislative and municipal approval of this project. In Public Act 85–1145, S.B. 1171, the Illinois Legislature conveyed approximately 18.5 acres of the lakebed to Loyola for the purpose of expansion. In this act, the legislature acknowledged that it holds the title of submerged lands in trust for the people of Illinois. However, because the public would benefit from the lakefill in various ways, the legislature reasoned that it had the power to convey the land to Loyola. In addition to obtaining approval from the Illinois legislature, Loyola also entered into a contract with the Park District of the City of Chicago allowing Loyola to proceed with the project.

After securing the approval of state and local governmental entities, Loyola also cleared federal statutory hurdles. Pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344, and § 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, Loyola had to obtain a permit from the Corps before proceeding with construction. Loyola submitted a permit application on December 9, 1988. In addition to its permit review under the Clean Water Act and the Rivers and Harbors Act, the Corps was also required to consider the potential environmental impact of the project the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. The Corps received and considered information provided by Loyola and its consultants, state and federal agencies, citizens' groups and individuals. The Corps ultimately concluded that the project would have no adverse impact on the environment, and issued a Finding of No Significant impact ("FONSI"), pursuant to 33 C.F.R. part 325. Because the Corps issued a FONSI, it was not required to prepare an Environmental Impact Statement ("EIS") under NEPA. The Corps also concluded that the project was permissible under the Clean Water Act and the Rivers and Harbors Act. Accordingly, on April 20, 1990, the Corps issued a permit to Loyola, which proceeded with its plans to begin construction of the project.[3]

---

They contend that our consideration of an affidavit attached to the Federation's reply to the Corps' memorandum would prejudice the defendants if we treat the current motion as dispositive. This affidavit relates solely to the issue of whether the Corps' actions were arbitrary and capricious. However, because we need not reach the issue of the propriety of the Corps' permit review, the challenged affidavit is immaterial to our resolution of this matter. Therefore, we will treat the Federation's motion for preliminary relief as a motion for permanent injunctive relief.

2. Department of the Army Permit Evaluation and Decision Document, p. 1; Loyola University Environmental Impact Statement, vol. 1, p. 2.

3. At the June 4, 1990 hearing, Loyola represented that it would not begin the lakefill without giving the parties and the Court five days notice. On June 18, 1990, Loyola gave notice that it could begin placement of the lakefill as early as June 25, 1990.

The Federation seeks to enjoin the construction of the lakefill. Its complaint for declaratory and injunctive relief recites several legal grounds upon which an injunction should issue. The Federation attacks both the Corp's decision to issue the permit and the validity of the legislative grant of property to Loyola. Because we find that the legislative conveyance of the lakebed to Loyola violated the public trust doctrine, we need not reach the issue of whether the Corp's review of the permit application was arbitrary or capricious.

The classic statement of the public trust doctrine was promulgated in *Illinois Central Railroad Company v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). In this case, the Supreme Court invalidated the transfer of 1000 acres of submerged lands in Lake Michigan to the Illinois Central Railroad. The Court explained that dominion and sovereignty over submerged lands belong to the State in which the land is found. *Id.* at 435, 13 S.Ct. at 111. However, the title to these submerged lands is "different in character from that which the State holds in lands intended for sale." *Id.* at 452, 13 S.Ct. at 118. "It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties." *Id.* "The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and the soils under them, so as to leave them entirely under the use and control of private parties ... than it can abdicate its police powers in the administration of government and the preservation of peace." *Id.* at 453, 13 S.Ct. at 118.

Since the Supreme Court's decision in *Illinois Central Railroad Co. v. Illinois*, several attempts by the State of Illinois to transfer public lands have been scrutinized under the public trust doctrine. For example, in *Illinois Cent. R. Co. v. City of Chicago*, 173 Ill. 471, 50 N.E. 1104 (Ill. 1898), the Illinois Supreme Court, relying heavily on *Illinois Central Railroad Co. v. Illinois*, held that the Illinois legislature lacked the power to allow the Illinois Central Railroad to appropriate a parcel of the lakebed for private use. Similarly, in *People v. Kirk*, 162 Ill. 138, 45 N.E. 830 (Ill. 1896), the Illinois Supreme Court utilized the public trust doctrine to evaluate a transfer of the lakebed. In this case, a portion of the lakebed was transferred in order to construct an extension of Lake Shore Drive. The Court found that the transfer did not violate the public trust doctrine because the legislature had not attempted to relinquish its power over the land and because the project would directly benefit the public. *Id.* at 835. *See also, Paepcke v. Public Building Commission of Chicago*, 46 Ill.2d 330, 263 N.E.2d 11 (Ill.1970) (Diversion of land previously used as a park to a new public use did not violate public trust doctrine).

The most recent and exhaustive analysis of the public trust doctrine was given in *People ex rel. Scott v. Chicago Park Dist.*, 66 Ill.2d 65, 4 Ill.Dec. 660, 360 N.E.2d 773 (Ill.1976). The Illinois Attorney General challenged a bill which conveyed 194.6 acres of land submerged in the waters of Lake Michigan to the United States Steel Corporation ("U.S. Steel"). The Illinois Supreme Court observed that, "[i]t is obvious that Lake Michigan is a valuable resource belonging to the people of this State in perpetuity ... and any attempted ceding of a portion of it in favor of a private interest has to withstand a most critical examination." *Id.* 4 Ill.Dec. at 667, 360 N.E.2d at 780. The Court ultimately concluded that the conveyance of land to U.S. Steel could not withstand this critical examination.

In holding that the conveyance violated the public trust doctrine, the Court focused on the purpose behind the challenged legislation. Reviewing its prior public trust jurisprudence, the Court noted that it had never upheld a grant of governmental land where its primary purpose was to benefit a private interest. *Id.* 4 Ill.Dec. at 667, 360 N.E.2d at 780. Indeed, the Court observed that in the only case in which a grant to a private entity had been sustained, *People ex rel. Moloney v. Kirk*, "the main purpose of the statute was to allow public officials to construct a needed extension of Lake

Shore Drive for direct public benefit." *Id.* 4 Ill.Dec. at 666, 360 N.E.2d at 779. Therefore, the Court concluded that in order to satisfy the public trust doctrine, the primary purpose of the challenged grant must be to benefit the public, rather than a private interest. Moreover, the Court held that the public purpose advanced by the grant must be direct. Thus, it found that benefits to the public through additional employment and economic improvement were "too indirect, intangible, and elusive to satisfy the requirement of a public purpose." *Id.*

 Three basic principles can be distilled from this body of public trust case law. First, courts should be critical of attempts by the state to surrender valuable public resources to a private entity. *People ex rel. Scott v. Chicago Park Dist.*, 4 Ill.Dec. at 667, 360 N.E.2d at 780; *People ex rel. Moloney v. Kirk*, 45 N.E. at 833; *Paepcke v. Public Building Comm. of Chicago*, 263 N.E.2d at 16. Second, the public trust is violated when the primary purpose of a legislative grant is to benefit a private interest. *Illinois Central Railroad v. Illinois*, 146 U.S. at 453, 13 S.Ct. at 118; *People ex rel. Scott v. Chicago Park Dist.*, 4 Ill.Dec. at 668, 360 N.E.2d at 781; *Illinois Cent. R. Co. v. City of Chicago*, 50 N.E. at 1108. Finally, any attempt by the state to relinquish its power over a public resource should be invalidated under the doctrine. *Illinois Central Railroad v. Illinois*, 146 U.S. at 453, 13 S.Ct. at 118; *People ex rel. Scott v. Chicago Park Dist.*, 360 N.E.2d at 779; *People ex rel. Moloney v. Kirk*, 45 N.E. at 835.

 Applying these criteria to the legislative grant of the lakebed to Loyola, it is apparent that the transfer violates the public trust doctrine. First, while the project has some aspects which are beneficial to the public, the primary purpose of the grant is to satisfy a private interest. Loyola sought and received the grant in order to satisfy its desire for a larger campus. The improvement of Hartigan Park Beach, erosion protection and other measures may benefit the public, but these benefits are only incidental to the primary and private goal of enlarging the Loyola campus.

While such improvements may have made the project more palatable to Illinois legislators, the inescapable truth is that the lakebed property will be sacrificed to satisfy Loyola's private needs. Under the public trust doctrine, such a sacrifice cannot be tolerated.

Not only does the challenged legislation give away public trust property to satisfy a private interest, but it also constitutes an attempt to relinquish state power over this property. Upon completion of the project, Loyola will become the owner of 18.5 acres of land which previously belonged to the state. Accordingly, the state will relinquish its control over the and its corresponding ability to safeguard the interests of the public as to this land.

Loyola contends that the limitations placed on its ownership by the State are sufficient to constitute state control over the property. By the terms of the conveyance, Loyola is not allowed to construct buildings or parking areas on the lakefill. The state also has a right of reentry should Loyola attempt to transfer the property to any entity which does not operate as a nonprofit educational institution. In addition, the legislation provides "[s]ubject to Loyola University's rights and obligations of ownership, including but not limited to maintenance and security, public access to, and public use and enjoyment of, the lakefill shall not be unreasonably denied." Public Act 85–1145, S.B. 1171 § 1(e)(1)(iii).

It remains to be seen whether these restrictions are more than illusory. For example, subsequent legislation could be passed which lifts the restrictions placed on the conveyance. Alternatively, the State of Illinois could choose not to exercise its right of re-entry or otherwise enforce the restrictions which are to be placed on the quitclaim deed.

However, even if we accept the proposition that the conditions of conveyance constitute bonafide restrictions, we do not agree that these restrictions are sufficient to constitute retention of public control over the lakefill. Although Loyola would lack the complete discretion over the use of its property, it is undeniable that its rights

would be superior to those of the public. The enabling legislation gives Loyola the power to control public access to the property. However, as the property currently exists, citizens have access to Lake Michigan, free "from the obstruction or interference of private parties." *Illinois Central Railroad Company v. Illinois,* 146 U.S. at 452, 13 S.Ct. at 118. The discretion vested in Loyola by the legislature is precisely the type of restriction which the public trust doctrine is intended to proscribe.

▇ Loyola suggests that we should not apply the public trust doctrine because the lakefill will increase the public's opportunity to enjoy that portion of the lakefront. Loyola observes that the existing shoreline is privately owned by Loyola, with no right of public access. In addition, this portion of the lake shore has been damaged by erosion. Therefore, Loyola reasons that if it is allowed to complete the lakefill, the public will be in a better position to enjoy the lake because of the aesthetic improvement to the coastline and the property on the whole.

This argument is seriously flawed. Loyola ignores the fact that the public will have to sacrifice 18.5 acres of publicly held land in order to obtain a coastline to which it has unlimited access. Moreover, it glosses over the fact that the public is actually gaining nothing. The public currently has unrestricted access to the submerged lands which will become the new coastline. In reality, the public is losing its right of access to the portion of the lake which would become the interior portion of the lakefill. In essence, Loyola's argument that the public will gain from the construction of the lakefill is merely a value dependent assessment of the best use of the property. This judgment is not only highly subjective, but also irrelevant to an analysis of the propriety of a grant of public land.

▇ Loyola also argues that we should be deferent to the Illinois legislature's determination that the grant at issue did not violate the public trust. In both the debate before the law was passed and in the legislation itself, the legislature acknowledged that it held the lakebed in trust for the public and declared that the grant would not violate this trust because of the project's numerous public benefits. According to Loyola, we should yield to this specific legislative consideration of public interest.

However, this claim is incorrect both as a matter of logic and precedent. The very purpose of the public trust doctrine is to police the legislature's disposition of public lands. If courts were to rubber stamp legislative decisions, as Loyola advocates, the doctrine would have no teeth. The legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public. Moreover, Illinois courts have acknowledged that courts are not encumbered by legislative expressions of public interest. For example, in *People ex rel. Scott v. Chicago Park Dist.,* 4 Ill.Dec. at 668, 360 N.E.2d at 781, the Illinois Supreme Court stated that, "[w]hile courts certainly should consider the General Assembly's declaration that given legislation is to serve a described purpose ... the self-serving recitation of a public purpose within a legislative enactment is not conclusive of the existence of such purpose." *Id., quoting People ex rel. City of Salem v. McMackin,* 53 Ill.2d 347, 291 N.E.2d 807 (Ill.1972). *See also, Paepcke v. Public Building Comm. of Chicago,* 263 N.E.2d at 16 (Court should be skeptical of governmental conduct allocating resource to the self interest of private parties). Therefore, we find that the legislative determination that the lakefill would serve the public is no obstacle to our conclusion that the grant was in breach of the public trust.

▇ Finally, although the argument is not specifically leveled at the public trust claim, Loyola suggests that we should withhold equitable relief because the Federation unreasonably delayed the filing of this action. We assume that Loyola is attempting to raise the affirmative defense of laches. At the outset, we note that the doctrine of laches is disfavored when the defense is raised against a plaintiff who is attempting to protect a substantial public

interest. *See, e.g., Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324, 1337 (10th Cir. 1982); *Daingerfield Island Protective Soc. v. Hodel,* 710 F.Supp. 368, 373 (D.D.C. 1989); *Connecticut Fund For Environment, Inc. v. Upjohn Co.,* 660 F.Supp. 1397, 1413 (D.Conn.1987); *Association Concerned About Tomorrow, Inc. v. Dole,* 610 F.Supp. 1101, 1118 (D.C.Tex.1985). The public interest at stake in this litigation is significant. Because of the magnitude of the potential loss of public access to Lake Michigan, the burden on Loyola is a heavy one.

■ We find that the Federation's public trust claim is not barred by laches. Laches is an equitable doctrine that is applied at the discretion of the district court. *Zelazny v. Lyng,* 853 F.2d 540, 543 (7th Cir. 1988). An essential element of laches is a lack of diligence by the plaintiff in pursuing its claim. *Id.* at 541; *Farries v. Stanadyne/Chicago Div.,* 832 F.2d 374, 378 (7th Cir.1987).[4] The Federation's attempts to oppose the lakefill were persistent and diligent. It doggedly pursued its objections to the project before the Corps until the permit was issued on April 16, 1990. The Federation filed its complaint before this Court on May 16, 1990. Although it is conceivable that the action might have been filed more quickly, we do not find the Federation's delay to be unreasonable given the complexity of the issues and the need to obtain requisite factual information before filing the action. Therefore, because of the substantial public interest at stake and the inadequate showing of dilatory conduct on the part of the plaintiff, we find that the equitable doctrine of laches does

not preclude the Federation's claim for injunctive relief.

### Conclusion

What we have here is a transparent giveaway of public property to a private entity. The lakebed of Lake Michigan is held in trust for and belongs to the citizenry of the state. The conveyance of lakebed property to a private party—no matter how reputable and highly motivated that private party may be—violates this public trust doctrine. This improper conveyance is not made any more palatable by attaching cosmetic conditions to the conveyance which permit restricted public access to the private property. Because the conveyance of lakebed to Loyola violated the public trust doctrine, Loyola, its agents and contractors are, effective immediately, permanently enjoined from placing any fill material in the lake or proceeding, in any manner, with further construction of the lakefill. Loyola should give prompt notice of this ruling to all interested parties. If it so chooses, the Federation may submit a draft order, consistent with this ruling, to effectuate or enforce this injunction.[5] It is so ordered.

### ON MOTION FOR RECONSIDERATION

■ On June 29, 1990, Loyola University of Chicago ("Loyola") filed a motion for reconsideration of this Court's order of June 22, 1990, granting a permanent injunction against the extension of its campus into Lake Michigan. This order in favor of plaintiff Lake Michigan Federation ("the Federation") was based on the public trust doctrine which provides that lakebed property is held in trust for the public and should not be ceded to a private entity. On

4. Because Loyola has failed to establish lack of diligence on the part of the Federation, we need not reach the second element of laches, prejudice to the defendant. However, we note that the permanent loss of 18.5 acres of lakebed to the public and future generations of citizens of the state far outweighs the pecuniary loss upon which Loyola relies to establish prejudice.

5. We wish to stress that the Federation has clearly satisfied the traditional criteria for injunctive relief. The Federation has succeeded on the merits of its public trust claim. In addition, the balance of equities favors the Federa-

tion. The irreparable harm to the Federation and the general public which would result if we did not issue this injunction far outweighs the pecuniary loss which will be borne by Loyola. Finally, the Federation has no adequate legal remedy through which to prevent the loss of public lands. *See, e.g., Northern Cal. Power Agency v. Grace Geothermal,* 469 U.S. 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (1984); *Scruggs v. Moellering,* 870 F.2d 376, 378 (7th Cir.1989); *Hubbard Business Plaza v. Lincoln Liberty Life Ins. Co.,* 649 F.Supp. 1310 (D.Nev.1986).

July 11, 1990, before its reply brief in support of its motion for reconsideration was due, Loyola announced at a press conference the abandonment of its lakefill project.[1] On the same day, Loyola wrote this Court: "We have decided to waive the right of Loyola University of Chicago to file a reply in support of its motion for reconsideration. You may consider the motion fully briefed and ready for disposition." Thus, although Loyola has publicly abandoned the lakefill project, it nonetheless requests that we rule upon its motion for reconsideration.

The sole thrust of the motion for reconsideration is that the Federation should be barred from asserting its claims under the doctrine of laches. Despite the fact that Loyola did not directly raise this claim in opposition to the Federation's motion for injunctive relief, we addressed this issue in our June 22 ruling. We observed that courts are extremely reluctant to apply the doctrine of laches when, as in this case, a plaintiff is attempting to safeguard an important public interest. See, e.g., Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1337 (10th Cir.1982); Dangerfield Island Protective Soc. v. Hodel, 710 F.Supp. 368, 373 (D.D.C.1989); Connecticut Fund For Environment, Inc. v. Upjohn Co., 660 F.Supp. 1397, 1413 (D.Conn.1987); Association Concerned About Tomorrow, Inc. v. Dole, 610 F.Supp. 1101, 1118 (D.C.Tex. 1985). Therefore, any consideration of the applicability of the doctrine must be heavily weighted in favor of the Federation.

However, even if this presumption were not to come into play, the Federation would not be barred by laches. An essential element of the doctrine is inexcusable delay by the plaintiff. Zelazny v. Lyng, 853 F.2d 540, 541 (7th Cir.1988). This requirement reflects the equitable maxim that equity does not come to the aid of those who sleep on their rights. International Union, Etc. v. Local Union No. 589, 693 F.2d 666, 674 (7th Cir.1982). In the present case, however, the Federation did not slumber. It aggressively opposed the lakefill from the inception of the project. The administrative record is replete with references to the Federation's opposition.[2]

Loyola contends we should apply laches because the Federation waited to file suit until after the Army Corps issued a permit approving the project. According to Loyola, the Federation should have raised the public trust claim on July 29, 1988, when the Governor of Illinois approved the conveyance of the lakebed to Loyola. However, this delay was far from inexcusable. The Federation was not unreasonable in presenting its environmental objections to the Army Corps before commencing litigation. Indeed, had the Federation convinced the Army Corps to deny the permit application, its public trust claim would have been moot. Given the Federation's persistent and aggressive opposition to the lakefill, we see no basis for finding that they have inexcusably delayed their action before this court. For these reasons and those set forth in our June 22 opinion, we find that Loyola has not established that the Federation's claim should have been barred under the doctrine of laches.

■■■■ Although Loyola limits its argument on reconsideration to the doctrine of laches, the Court's ruling has been questioned on additional grounds. It has been suggested that Northwestern University's early 1960's lakefill extension of its campus (an extension apparently never challenged in court) is "precedent" in favor of approving the Loyola project. Significantly, Loyola has not raised Northwestern's campus extension as precedent before this Court. This, of course, is because Northwestern's unchallenged lakefill expansion is not *legal*

---

1. We take judicial notice of this press conference (July 12, 1990 Editions of *Chicago Tribune* and *Chicago Sun–Times* ) in order to address the question of mootness, which was not raised by either party. We do not consider the motion for reconsideration as moot for two reasons. First, neither party regards the motion as moot, and Loyola pointedly renewed its request that this Court decide the motion. Second, although Loyola has publicly announced its abandonment of the lakefill project, there is no legal impediment which would prohibit a timely reversal of its position. For these reasons, Loyola's motion for reconsideration is not moot.

2. See, for example, the Department of the Army Permit Evaluation and Decision Document at p. 19.

precedent. The law does not permit one entity to violate the law because another has successfully evaded the same law on another occasion. There is no court decision on the Northwestern campus extension for the reason that no law suit was filed at the time enabling a court of law to rule upon the extension's validity. The Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants. *Deakins v. Monaghan*, 484 U.S. 193, 108 S.Ct. 523, 528, 98 L.Ed.2d 529 (1988). Unlike the Northwestern project, Loyola's lakefill project has been challenged in this Court. We cannot abdicate our responsibility to decide the controversy before us on its merits simply because a challenge was not made years ago to a similar project.

■ The public trust doctrine has also been attacked as a narrow ideology. Implicit in this attack is the suggestion that this Court should unilaterally abandon the public trust doctrine or carve out an exception from the prohibitions of the doctrine for respected non-profit private entities. This Court can do neither.

■ The public trust doctrine is the law of the State of Illinois. It has been so since 1892. *Illinois Central Railroad Company v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). A federal court may not decide as a matter of policy that state law should be reversed. *See, e.g., Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir.1987). Nor should the

federal court carve out an exception to the law because the affected private party is a respectable non-profit entity. It is basic that our nation operates under the rule of law. That means that the law of the land must be applied with equanimity to us all—including the influential and well regarded.

At its press conference,[3] Loyola stated that it must now abandon its lakefill project solely because of the cost and time involved in any appeal. Whether or not to pursue this case further is, of course, a decision solely for Loyola. However, the abandonment of a multimillion dollar project which has been ongoing for years solely for this reason strains credulity. A prompt and relatively inexpensive review of this Court's ruling is available before the Seventh Circuit.[4] The legal issues have been promptly decided[5] and clearly drawn. They are important both from a legal and environmental standpoint. If Loyola believes that these issues have been incorrectly decided, it should pursue its appeal. Had Loyola won before this Court, certainly the Federation would have appealed from any such decision—resulting in the very same expected expense and delay which is purportedly the basis for Loyola going no further. Would Loyola have abandoned a successful decision before this Court because of the cost and time required to defend such decision on appeal? Could any litigant not anticipate the possibility of an appeal in a case of this importance, regardless of the outcome in the

---

**3.** The Court has taken judicial notice of this press conference, and, as such, it is part of the record in this case. *See* fn. 1.

**4.** Fed.R.App.P. 8(a) allows a party to seek a stay of an injunction pending a ruling on appeal. Moreover, U.S.Ct. of App. 7th Cir. Rule 8, 28 U.S.C.A., expressly contemplates emergency proceedings in the context of an application for a stay of injunction. The Seventh Circuit has not hesitated to apply these provisions. *See e.g., U.S. v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1405 (7th Cir.1990); *Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337, 1339 (7th Cir.1987). Indeed, the Seventh Circuit has even been willing to stay the enforcement of a district court order pending its consideration of a motion to stay under Rule 8(a). *Robbins v. Pepsi-Cola Metropolitan Bottling Co.*, 800 F.2d 641, 642 (7th Cir. 1986).

**5.** The procedure of treating Loyola's motion for a preliminary injunction as a motion for permanent injunction has been questioned—but not by Loyola in any pleading or at any court hearing. Loyola has acquiesced to this procedure. And the motion would not have been treated as one for permanent injunction had Loyola objected. *See* fn. 1 of June 22 opinion. Indeed, after all parties had stated they had no additional evidence or arguments to offer, this dealt promptly with the merits of the case, thereby assuring that there would be no long drawn out proceedings in this Court (multiple hearings on successive motions for a temporary restraining order and a preliminary injunction and, eventually, a permanent injunction hearing) which would exacerbate the parties' costs of litigation and delay any final ruling. All the parties—including Loyola—obviously recognized these benefits when they agreed to these accelerated procedures.

District Court? Given the amount of money that Loyola has invested and plans to invest in this project, the cost of appellate review is relatively negligible. Also, given the amount of time Loyola has already devoted to this project, the short time now required to effect its appeal is *de minimis.*

### Conclusion

In our June 27 opinion, we clearly defined the issue before the Court. "What we have here is a transparent giveaway of public property to a private entity. The lakebed of Lake Michigan is held in trust for and belongs to the citizenry of the state. The conveyance of lakebed property to a private party—no matter how reputable and highly motivated that private party may be—violates this public trust doctrine. This improper conveyance is not made any more palatable by attaching cosmetic conditions to the conveyance which permit restricted public access to the private property." Loyola's motion for reconsideration suggests no reason why this conclusion should be reconsidered. We urge Loyola to seek the prompt review available to it before the Circuit Court on these important issues. The motion for reconsideration is denied. It is so ordered.