The Illinois Central Railroad Company

*v.*

The City of Chicago.

*Opinion filed June 18, 1898.*

1. STATUTES—*in absence of ambiguity words must be given their natural meaning.* Where the language of a statute is clear and unambiguous there is no room for construction, and the words used must be taken in their ordinary, natural and commonly received sense.

2. RAILROADS—*section 3 of act incorporating Illinois Central Railroad construed.* Section 3 of the act of 1851 incorporating the Illinois Central Railroad Company, granting a strip of land two hundred feet wide for right of way and providing that the company may take possession of "any lands, *streams* and materials" for depots, etc., does not extend to lands lying outside the right of way and submerged by Lake Michigan, as such lake is not a "stream."

3. WATERS—*State holds title to bed of Lake Michigan in trust for the public.* Section 3 of the act incorporating the Illinois Central Railroad Company, which provides that all "lands, *waters*, privileges and materials belonging to the State are hereby granted to said corporation" for road purposes, does not empower such corporation to use for such purposes land lying outside its right of way and submerged by the waters of Lake Michigan, as the State holds such lands in trust for the public, and cannot dispose of the same for private use except in parcels for navigation improvement, where such disposition will not impair the public interest in what remains.

APPEAL from the Superior Court of Cook county; the Hon. HENRY V. FREEMAN, Judge, presiding.

This is a bill in equity filed by the Illinois Central Railroad Company against the city of Chicago, praying for an injunction restraining the city from interfering with or preventing the company from filling in certain land covered by the shallow waters of Lake Michigan, lying between Twenty-fifth and Twenty-seventh streets, produced, for the purpose of constructing an engine house thereon. The bill is quite voluminous, but it will only be necessary to set out those provisions which have a direct bearing on the questions involved.

The bill sets out the history of the national charter of the Illinois Central Railroad Company, and its consideration in Congress, resulting in the passage of the act of Congress approved September 20, 1850. (9 U. S. Stat. 466.) By that act the right of way through the public land was granted to the State of Illinois for the construction of the railroad from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi rivers, with a branch of the same to Chicago, on Lake Michigan, and another *via* the town of Galena, in said State, to Dubuque, in the State of Iowa, with the right, also, to take the necessary lands, waters and materials of earth, timber, etc., for the construction of the railroad. The act also granted to the State of Illinois, for the purpose of aiding and making the railroad and branches above named, every alternate · section of land designated by even numbers, for six sections in width, on each side of the railroad and branches. By the act it was further provided that the railroad and branches should be and forever remain a public highway for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States.

The bill further sets forth that the company was created, organized under and now exists by virtue of the act of the legislature of the State of Illinois approved February 10, 1851, entitled "An act to incorporate the

Illinois Central Railroad Company," (Private Laws of 1851, p. 61,) and by its charter it was authorized to survey, locate, construct, complete, alter, maintain and operate a road, with one or more tracks or lines of rail, from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi rivers, with a branch of the same into Chicago, on Lake Michigan, and also a branch *via* the city of Galena to a point on the Mississippi river opposite the town of Dubuque, in the State of Iowa; that by section 3 of its charter it was provided as follows: "The said corporation shall have right of way upon, and may appropriate to its sole use and control for the purposes contemplated herein, land not exceeding 200 feet in width through its entire length; may enter upon and take possession of and use all and singular any lands, streams and materials of every kind for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil-banks, turn-outs, engine houses, shops, and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. All such lands, waters, materials and privileges belonging to the State are hereby granted to said corporation for said purposes; but when owned or belonging to any person, company or corporation, and cannot be obtained by voluntary grant or release, the same may be taken and paid for, if any damages are awarded, in the manner provided in 'An act to provide for a general system of railroad incorporation,' approved November 5, 1849, and the final decision or award shall vest in the corporation hereby created all the rights, franchises and immunities in said act contemplated and provided: * * * *Provided*, that nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams."

The bill also avers that the company constructed its line of railroad within the then limits of the city of Chicago in the year 1852, and completed its railroad extending between the *termini* named in its charter, in the State of Illinois, in the year 1857; that the total number of miles of its railroad in the State, upon completion, was 706; that at the time of the construction of its railroad, in 1852, into the city of Chicago, the southern limits and boundary of the city extended only to Twenty-second street; that in 1852 it constructed its line of railroad immediately along the shore and partly over the shallow waters of Lake Michigan from Fifty-first street to Twenty-second street, then the southern boundary of the city, and that its railroad was constructed into the city of Chicago through the waters of Lake Michigan, pursuant to an ordinance of the city; that its railroad within the limits of the city was constructed on piling set in the open waters of Lake Michigan east of the shore; that between Park Row and Randolph street the distances in a direct east and west line between the shore line and the inner or west line of the piling on which the railroad of the company was constructed through the open waters of Lake Michigan varied from 5 feet at Park Row to 310 feet at Madison street, and that the depth of the water along the line of piling between the points above named varied from $2\frac{1}{2}$ to $9\frac{1}{2}$ feet; that the company now owns or controls by lease, and is now operating under one management, the whole of the trunk line as one continuous line from New Orleans, through the States of Louisiana, Mississippi, Tennessee, Kentucky and Illinois, into the city of Chicago; that it controls, by lease or otherwise, under the same management, many other lateral lines in the States above named, and also in the States of Wisconsin, Iowa, Minnesota and Dakota, which connect with and are tributary to the parent line of the company; that the number of miles now owned or controlled by the company under one management exceeds 4600.

It is further alleged in the bill that the city of Chicago is the business center of the various lines which constitute the system owned by the company; that the business carried on over the terminal tracks and facilities of the company within the present limits of the city of Chicago is so great and so constantly increasing that the whole of its right of way and lands contiguous thereto, within said limits, are used to their utmost capacity as yards, shops, depot grounds, side-tracks, switching-tracks, storage-tracks, delivery-tracks, team-tracks and other structures, all of which are absolutely necessary as terminal facilities to enable the company to carry on and conduct its business as a common carrier of freight and passengers, and that all the tracks, structures and appliances of its terminal facilities are necessary and essential to enable the company to carry on its business; that the business of the company as a common carrier greatly increases from year to year, and that it has so continued to increase that its terminal facilities in the city are not wholly adequate for the purposes and uses prescribed and intended by its charter. The bill sets out in detail its business and its increase from year to year, and alleges that its terminal facilities in the city of Chicago have been found to be wholly inadequate to enable the company to carry on its business; that in order to meet the increased business necessities and requirements of the company it is absolutely necessary that the company should construct, operate and use an engine house 316 feet in diameter and containing forty stalls, together with a machine shop, turn-table, coal chute and other structures; that it has no engine house whatever at which it is practicable for its engines to be overhauled and fitted for operation; that it has no land whatever unoccupied by other necessary tracks and structures, which is either sufficient in dimensions or suitably located, upon which to locate and construct an engine house of the necessary dimensions and capacity, with the necessary appurte-

nances thereto, required and necessary for the business of the company, and that in order to build such engine house and the appurtenances it is necessary to construct the same upon land covered by the shallow waters of Lake Michigan, at a point between Fifty-first street and Eighteenth street.

It is also set up in the bill that in 1852, at the time of the construction of the road within the city of Chicago, it purchased certain lands lying between Twenty-fifth and Twenty-seventh streets, bordering on the shore of Lake Michigan; that in the deeds the shore of Lake Michigan was designated as the east boundary line thereof, and that the company, as owner, was vested with all the riparian rights and privileges incident to the ownership in fee of the shore land; that in the year 1882 it constructed a breakwater or bulkhead in the shallow waters of Lake Michigan, the same being located and constructed in front of the land which the company purchased in 1852, above referred to, the east and west line of the breakwater on the north extending from a point on the shore continuous with the northern boundary of the land conveyed to the company in 1852, and extending to a point 200 feet easterly from the shore line, running thence southerly a distance of 781 feet, and thence westerly to the shore line, a distance of 325 feet; that the breakwater built by the company in 1882 was constructed on two rows of piling driven into the bed of Lake Michigan, and the space between the rows of piling was filled in with stone, in order to strengthen the breakwater and enable it to withstand the force of Lake Michigan during periods of storm; that all the shore land embraced within the lines of the breakwater now is, and ever since the year 1852 has been, owned in fee simple by the company, and that it is entitled to all the riparian rights and privileges incident to the ownership in fee of the shore land; that the superficial area of the land covered by the shallow waters of Lake Michigan lying within the lines of the

breakwater and shore line of Lake Michigan is 195,200 square feet, or 4.48 acres, and that the superficial area of the ground necessary for the construction of the engine house, machine shop, coal chute and other necessary structures appurtenant thereto is 168,426.9 square feet, or 3.86 acres.

The bill further states that in the year 1894 a part of the breakwater referred to as having been constructed by it in the year 1882 was destroyed by a storm on Lake Michigan; that it being necessary, to enable the company to carry on and conduct its business, that an engine house of sufficient capacity to meet its necessary requirements and demands in conducting its business and to accomplish the objects for which the company was chartered be constructed and erected at a reasonably suitable and proper location, and it being necessary that such engine house should be erected and constructed upon the lands submerged by the shallow waters of Lake Michigan lying in front of land on the shore of Lake Michigan owned in fee simple by the company, the company caused plans to be made, as before stated, for an engine house 316 feet in diameter and containing forty stalls or compartments, and under the power, authority and right given and vested in the company by its charter, and in the exercise of its rights as riparian owner, it elected and determined to locate and construct said engine house on land submerged by the shallow waters of Lake Michigan lying within the limits of the breakwater, and to repair the breakwater and fill in the submerged lands lying within the limits of the breakwater, for the purpose of constructing thereon said engine house and the necessary appurtenances thereto; that the breakwater does not in any way interfere with the navigation of Lake Michigan; that the Secretary of War gave his consent to the repair of the breakwater; that the commissioner of public works of the city of Chicago also gave his consent to the repair; that the company placed upon the ground large quantities of material

for repairing the breakwater, the filling in of the lands covered by the shallow waters of Lake Michigan embraced within the lines thereof, and for the construction of the engine house and appurtenances thereto on the lands to be filled in; that it repaired the breakwater by driving two rows of piling, and filled in a large part of the space between the exterior and interior line of piling with stone, for the purpose of enabling the breakwater to withstand the force of Lake Michigan; that the company was prevented by the police force of the city of Chicago, acting under the orders and direction of the mayor, from completing the work; that the city of Chicago, without right or authority, interferes with and prevents the company from filling in the land within the lines of said breakwater.

The bill prayed for an injunction restraining the city from interfering with the company. The Superior Court denied the application for an injunction and dismissed the bill, and the complainant appealed.

C. V. Gwin, (James Fentress, of counsel,) for appellant:

Land covered by the waters of Lake Michigan belongs to the State of Illinois. *Illinois* v. *Railroad Co.* 33 Fed. Rep. 730; *Railroad Co.* v. *Illinois,* 146 U. S. 387.

The Illinois Central Railroad Company has power, under its charter, to take possession of and use land covered by the shallow waters of Lake Michigan, for the purpose of constructing thereon an engine house necessary for altering, maintaining, preserving and the complete operation of its road, when such use does not interfere with navigation.

The right and power of the company to enter upon, take possession of and use land covered by the shallow waters of Lake Michigan, for the purpose of constructing thereon an engine house necessary for altering, maintaining, preserving and the complete operation of its

road, like the power of purchase and the power of eminent domain conferred upon it for like purposes, is a continuing right and power, and may be called into existence whenever the reasonable necessities of the road require that it should be exercised. *Park Comrs.* v. *McMullen*, 134 Ill. 170; *Railroad Co.* v. *Railroad Co.* 113 id. 156; *Fisher* v. *Railroad Co.* 104 id. 323; *Bowman* v. *Railroad Co.* 102 id. 459; *Railroad Co.* v. *Wilson*, 17 id. 123; *Railroad Co.* v. *Kip*, 46 N. Y. 546; Lewis on Eminent Domain, sec. 259.

The State has the right to make such grant of the use of the lands covered by the waters of Lake Michigan, if navigation is not thereby interfered with. *Illinois* v. *Railroad Co.* 33 Fed. Rep. 730; *Railroad Co.* v. *Illinois*, 146 U. S. 387; Private Laws of 1851, sec. 3, p. 61; *Rucker* v. *Railroad Co.* 14 Ill. 353.

"Land" comprehends, in its legal signification, any ground, soil or earth whatsoever, as arable, meadows, pastures, woods, moors, waters, marshes, furzes and heath.   1 Coke's Inst.; 2 Blackstone, 16.

In law, "land" signifies any ground forming a part of the earth's surface which can be held as individual property, whether soil or rock or water-covered, and everything annexed to it, whether by nature, as trees, water, etc., or by the hand of man, as buildings, fences, etc. Bouvier's Law Dict.; Webster's Dict.; Kent's Com. 401; Century Dict.

A thing within the intention is within the statute though not within the letter, and a thing within the letter is not within the statute unless within the intention. *Mason* v. *Finch*, 2 Scam. 223; *Burke* v. *Monroe County*, 77 Ill. 610; *People* v. *Canal Comrs.* 3 Scam. 153; *Zarresseller* v. *People*, 17 Ill. 101; *Stribling* v. *Prettyman*, 57 id. 371.

Judicial notice will be taken of historical and other facts relating to legislation, when occasion arises for resort to such extrinsic facts appertaining to the circumstances with reference to which the statute was passed, and the court may obtain such information from any au-

thentic source. Sutherland on Stat. Const. secs. 298, 300; Endlich on Statutes, sec. 29.

Charles S. Thornton, Corporation Counsel, and Granville W. Browning, Assistant, for appellee:

The State cannot grant lands under waters of Lake Michigan to private parties except in aid of commerce, or to build piers and docks in aid of navigation. *Railroad Co.* v. *Illinois*, 146 U. S. 387; *Diederich* v. *Railroad Co.* 42 Wis. 248.

The charter of appellant of February 10, 1851, must be strictly construed, and all intendments must be taken against appellant. *State* v. *Phosphate Co.* 21 L. R. A. 189; *Matter of Swigert*, 119 Ill. 83; *Deere* v. *Chapman*, 25 id. 498; *Fertilizing Co.* v. *Hyde Park*, 70 id. 634.

If section 3 of appellant's charter had given appellant the right to occupy part of the submerged lands of Lake Michigan it could not have been a continuing grant. The State holds the lands under the lake in trust, and the legislature of 1851 could not permanently alienate the control and discretion over such lands vested in the State as trustee. The claim that such a grant is contained in the charter, and that with appellant's acceptance it constitutes an inviolable contract, is untenable. *Railroad Co.* v. *Illinois*, 146 U. S. 387; *People* v. *Kirk*, 162 Ill. 139; *Field* v. *Barling*, 149 id. 556.

The only grant in the charter, so far as waters are concerned, is of streams. The legal status in Illinois of submerged land under streams is different from that of lands under Lake Michigan. The title of the latter is in the State, in trust; of the former, in the riparian owner. "Streams" cannot include Lake Michigan or its waters. *Hardin* v. *Jordan*, 140 U. S. 371; *Fuller* v. *Shedd*, 161 Ill. 462; *People* v. *Silberhorn*, 32 L. R. A. 694.

A general description following a specific enumeration of objects or things will be held to include only such things or objects as are of the same kind as those specifically enumerated. *In re Swigert*, 119 Ill. 89.

Where words are plain, and no ambiguity arises, no construction is permitted. The words must be taken as written. Sutherland on Const. of Stat. sec. 237; *Martin* v. *Swift*, 120 Ill. 490; *Sullivan* v. *Richardson*, 33 Fla. 121.

Mr. Justice Craig delivered the opinion of the court:

On the application for an injunction the facts set forth in the bill were admitted to be true, and the question presented by this record is, admitting the facts set out in the bill to be true, whether the court erred in denying the motion for an injunction and in dismissing the bill.

It is contended in the argument of counsel for appellant that the Illinois Central Railroad Company has the right and power, under its charter, to enter upon, take possession of and use land covered by the shallow waters of Lake Michigan for the purpose of constructing thereon an engine house necessary for the altering, maintaining, preserving and complete operation of its road, when such use does not interfere with navigation.

It appears, as has been seen from the allegations of the bill, that in 1852, when the railroad was constructed within the city of Chicago, the company purchased certain lands lying between Twenty-fifth and Twenty-seventh streets, bordering on the shore of Lake Michigan, the shore of the lake being the east boundary line of the lands so purchased. The submerged land in question lies between Twenty-fifth and Twenty-seventh streets, extending into the lake in front of the land purchased in 1852, enclosed by a breakwater erected by the company in 1882. The breakwater extends into the lake 200 feet on a line contiguous with the north boundary line, extended, of the lands purchased by the company, thence southerly 781 feet, thence westerly a distance of 325 feet to the shore line. If the space thus enclosed should be filled in as is proposed by the company, the area of land purchased by the company bordering on the lake will be increased to the extent of 4.48 acres heretofore covered

173—31

by the waters of the lake. This tract of 4.48 acres the railroad company proposes to fill in and then erect upon it its engine house. It claims the right to fill in the land and erect its engine house upon it on two grounds: First, upon the ground that section 3 of its charter confers the power; and second, because it owns the fee of the shore lands and has the right as a riparian owner.

Section 3 of the act incorporating the Illinois Central Railroad Company, approved February 10,1851, provides: "The said corporation shall have right of way upon, and may appropriate to its sole use and control for the purposes contemplated herein, land not exceeding 200 feet in width through its entire length; may enter upon and take possession of and use all and singular any lands, streams and materials of every kind for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil-banks, turn-outs, engine houses, shops, and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. All such lands, waters, materials and privileges belonging to the State are hereby granted to said corporation for said purposes; but when owned or belonging to any person, company or corporation, and cannot be obtained by voluntary grant or release, the same may be taken and paid for, if any damages are awarded, in the manner provided in 'An act to provide for a general system of railroad incorporation,' approved November 5, 1849, and the final decision or award shall vest in the corporation hereby created all the rights, franchises and immunities in said act contemplated and provided: * * * *Provided*, that nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams."

In the construction of a statute, where the words used are clear and unambiguous they must be taken in their ordinary, natural and commonly received sense. (*Deere* v.

*Chapman*, 25 Ill. 610.)  Indeed, where the language of a statute is plain and unambiguous there is no room for construction, and the words used must have their natural meaning, unless some absurd or injurious consequence will result which was not foreseen by the legislature. *Martin* v. *Swift*, 120 Ill. 488.    See, also, Sutherland on Const. of Stat. sec. 237.

Adopting the rule of construction indicated, which we regard as the correct one, does section 3 of the charter empower the railroad company, at any time it may see proper, to enter upon and appropriate to its own use, for railroad purposes, lands covered by the waters of Lake Michigan?  Conceding that the first clause of section 3 conferred upon the railroad company the right to take for right of way a strip of land 200 feet wide upon the location of its line in 1852, that fact has no bearing on the question involved here.  The land for right of way in the city of Chicago and along the entire line was selected upon the location of the line of road in 1852, and as to lands taken for right of way there has been no controversy from any quarter.  The land here involved is no part of the 200 feet selected or granted for right of way, but it is a tract covered by water beyond the right of way, and the right to appropriate it is claimed under the second clause of section 3, which declares that the railroad company "may enter upon and take possession of and use all and singular any lands, streams and materials of every kind for the location of depots and stopping stages, for the purpose of constructing  *  *  *  station grounds,  *  *  *  engine houses," etc., necessary for the construction and operation of the road.  The word "lands," as used, cannot mean any portion of Lake Michigan unless that word is given a meaning different from what is generally understood when the word has been used.  Webster, in defining the word "land," says: "Earth, or the solid matter which constitutes the fixed portion of the globe, in distinction from the waters, which constitute

the fluid or movable part." Under this definition there is a marked distinction between land and water, so that when the word "land" is used it cannot be so construed as to include water. Moreover, if the legislature intended, by the use of the word "lands," to include lands covered by water, why also use the word "streams?"—for all streams are but lands covered with flowing water. We think, therefore, it is apparent that the legislature, by the use of the word "lands" in section 3 of the charter, did not intend to include lands covered by the waters of Lake Michigan.

In regard to the word "streams" used in the section, that term has a well-defined meaning. It is defined in the Century Dictionary as follows: "A course of running water; a river, rivulet or brook. Second, a steady current in a river or in the sea, especially the middle or most rapid part of a current or tide, as the Gulf Stream. Third, a flow; a flowing; that which flows. Fourth, anything issuing from a source and moving or flowing continuously. Fifth, a continued course or current." In *Trustees of Schools* v. *Schroll*, 120 Ill. 509, we had occasion to consider what was meant by the use of the word "stream," and it was expressly held that the distinction between a stream and a pond or lake is, that in the one case the water has a natural motion or current, while in the other the water in its natural state is substantially at rest; that this is so, independently of the size of the one or the other; that the fact of some current in a body of water is not of itself, in every instance, sufficient to make it a stream, nor will the swelling out of a stream into broad water sheets make it a lake. The word "stream," so far as we are advised, has never been held to include the waters of a great lake like Lake Michigan. If the word can be applied to a large body of water like Lake Michigan it may also be applied to the ocean.

The language of the charter does not authorize the company to enter upon and take possession of any lands,

waters and materials belonging to the State, as seems to be supposed, but the authority is to enter upon "any lands, streams and materials." The last clause of the section has an important bearing, showing that the authority conferred related to streams, and not to the lake. It declares: "Nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams." We are therefore of opinion that the grant in section 3, "all such lands, waters, materials and privileges belonging to the State are hereby granted to said corporation for said purposes," did not include lands covered by the waters of Lake Michigan.

But even if the grant in the charter was broad enough to include the waters of Lake Michigan, it does not follow that the railroad company would have the right, at any time it might see proper, to take and appropriate to itself any of the lands covered by the waters of Lake Michigan, provided only that the navigation of the lake is not interfered with. It is true that the State holds the title to the lands covered by the waters of Lake Michigan lying within its boundaries, but it holds the title in trust for the people, for the purposes of navigation and fishery. The State has no power to barter and sell the lands as the United States sells its public lands, but the State holds the title in trust, in its sovereign capacity, for the people of the entire State, as held in *People* v. *Kirk*, 162 Ill. 138.

This question was fully discussed in the Supreme Court of the United States in *Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 387, and it was there held, as we understand the decision, that it was grants of parcels of lands for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which do not impair the public interests in the lands and waters remaining, which are sustained by the courts. In the discussion of the question the court, among other things, said: "The in-

terest of the people in the navigation of the waters and in commerce over them may be improved, in many instances, by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands, and so long as their disposition is made for such purpose no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interests in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and water remaining. * * * A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power, and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are interested, like navigable

waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace."

It is not proposed, here, to take or appropriate the land in question for the erection of wharves, docks or piers, the construction of which may facilitate or aid the navigation of the waters of the lake, but the sole purpose seems to be to appropriate the submerged land for the private use of the railroad company. It is unreasonable to believe that the legislature, in the enactment of section 3 of the charter of the railroad company, ever intended to place in the hands of the company unlimited power to go on, from time to time, and appropriate to its own use parcel after parcel of the lands covered by the waters of Lake Michigan, and if such unlimited power was contemplated it transcended its authority. It, in effect, undertook to part with governmental powers, which it could not do.

We are, however, referred to three cases in support of the position of the railroad company: *Illinois Central Railroad Co.* v. *Rucker*, 14 Ill. 353, *Illinois* v. *Illinois Central Railroad Co.* 33 Fed. Rep. 730, and *Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 387. We do not regard the case first cited as one having a bearing on the question presented by this record. In that case, after the Illinois Central Railroad Company had located its line of road, with the consent of the city of Chicago, over the shore waters of Lake Michigan, the company applied to the county court of Cook county to appoint appraisers to assess damages to certain parties who owned land on the lake shore. The railroad having been located in front of the premises of said lake shore owners, and partly over the same, the

company sought to condemn this property, but the county court refused the application. Upon petition for *mandamus* to this court a *mandamus* was awarded, and the court held: First, that the railroad company had the right, with the consent of the city, to locate its line of road over the shallow waters of Lake Michigan on the line selected; second, that the right was not forfeited by the failure to locate prior to January 1, 1852; and third, it was the duty of the county court to appoint appraisers. It thus appears that no question was raised or decided, as we understand the case, in regard to the right of the railroad company to go beyond the 200 feet granted and selected for right of way and take lands covered by the waters of the lake for an engine house or for other railroad purposes named in the charter. As to the second case mentioned, that case was removed by writ of error to the Supreme Court of the United States, and the questions of law involved were settled in *Illinois Central Railroad Co.* v. *Illinois,* 146 U. S. 387. That case is also relied upon in the argument. There may be found expressions in the opinion of the court which might seem to favor the view of appellant, but when the facts of that case are taken into consideration and the entire opinion is examined we do not think that the case lends support to the position of appellant in this case.

It is also set up in the bill that the railroad company has the right, as a riparian owner, to fill in the lake and erect its engine house on the new-made land. But this question has not been discussed in appellant's argument, and we must regard it as waived. Moreover, under the facts presented by this record, we are aware of no well-considered case which would sustain the proposed acts of appellant in filling in the lake and erecting upon the newly-made land an engine house.

The decree of the Superior Court will be affirmed.

*Decree affirmed.*