(No. 48061.—)

THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, *et al.*, Appellees, v. THE CHICAGO PARK DISTRICT *et al.*—(United States Steel Corporation, Appellant.)

*Opinion filed Dec. 3, 1976.—Rehearing denied March 16, 1977.*

UNDERWOOD, RYAN, and CREBS, JJ., dissenting.

Rooks, Pitts, Fullagar & Poust, of Chicago (Henry L. Pitts and Laurence A. McHugh, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield (Fred F. Herzog, Richard W. Cosby, and George W. Wolff, Assistant Attorneys General, of counsel), for appellees.

MR. CHIEF JUSTICE WARD delivered the opinion of the court:

The General Assembly passed Senate Bill 782 (Laws of 1963, at 1229-31) on June 17, 1963, and it was signed by the Governor on June 26, 1963. The bill, in essence, provided for the conveyance by the State of Illinois of 194.6 acres of land submerged in waters of Lake Michigan to the United States Steel Corporation, hereafter referred to as defendant, upon its paying to the State Treasurer $19,460 and upon the Chicago Park District reconveying to the State an interest in the land it had received by certain legislation. Shortly after the bill was signed, Albert C. Droste brought two separate taxpayer actions in the circuit court of Cook County for the purpose of enjoining the sale. In one, his petition for leave to file a complaint under "An Act in relation to suits to restrain and enjoin the disbursement of public moneys by officers of the state" (Ill. Rev. Stat. 1963, ch. 102, pars. 11-16) was denied on the ground that this act did not give Droste as a taxpayer standing to sue. In the other, his complaint for declaratory relief was dismissed for want of equity. Droste appealed directly to this court, alleging constitutional questions were involved, and we affirmed both judgments on the ground that Droste lacked standing to sue. *Droste v. Kerner,* 34 Ill. 2d 495, 504-05.

The defendant, which proposes to construct a steel plant on the land to be reclaimed, tendered its draft on August 13, 1973, in the amount of $19,460 to the State

Treasurer, but it was returned three days later. The Attorney General commenced this action by filing a complaint in the circuit court of Cook County. The complaint sought a declaratory judgment that "An Act for the sale to United States Steel Corporation of the interest of the State of Illinois in certain lands" (Senate Bill 782) was void. Named as defendants were the Governor, the Secretary of State, the State Treasurer, the State Comptroller, United States Steel Corporation, the Chicago Park District and the Commissioners of the Chicago Park District. Subsequently, the Governor, the Secretary of State, the State Treasurer and the State Comptroller, on their motions, were realigned as plaintiffs. The trial court allowed the plaintiffs' motion for summary judgment, holding that Senate Bill 782 was void on the grounds that it violated the public trust doctrine, the fourteenth amendment of the United States Constitution, and the following provisions of the Illinois Constitution of 1970: article I, section 2; article IV, section 13; and article VIII, section 1(a). The defendant appealed directly to this court under our Rule 302(a) (58 Ill. 2d R. 302(a)); no appeal was brought by the Chicago Park District or its commissioners.

The defendant contends that the decision of this court in *Droste v. Kerner,* 34 Ill. 2d 495, operates as a bar under the doctrine of *res judicata* to the plaintiffs' challenging the validity of the legislative action. However, the burden of showing that a challenge is barred under *res judicata* is upon the party invoking the doctrine (*Chicago Historical Society v. Paschen,* 9 Ill. 2d 378; *City of Geneseo v. Illinois Northern Utilities Co.,* 378 Ill. 506), and we consider the defendant has not met this burden.

This court in *La Salle National Bank v. County Board of School Trustees of Du Page County,* 61 Ill. 2d 524, 528, considered a question of *res judicata* and, quoting from *People v. Kidd,* 398 Ill. 405, 408, stated: "[A] final judgment rendered by a court of competent jurisdiction on

the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action." Thus, before an adjudication can stand as a bar to a subsequent action, it must be determined whether the first action resulted in a final judgment on the merits. See *People ex rel. Williams v. Board of Education,* 350 Ill. 597, 601; see also *Monroe v. Collins,* 393 Ill. 553; *People ex rel. Porter v. Minnie Creek Drainage District,* 311 Ill. 228; 2 A. Freeman, Law of Judgments secs. 723-25 (5th ed. 1925).

Illustrating the necessity that a judgment on the merits is a requisite to the application of *res judicata,* this court has held the doctrine is not available when the prior action was dismissed for lack of jurisdiction. (*Weiland Tool & Manufacturing Co. v. Whitney,* 44 Ill. 2d 105, 113-14; *City of Geneseo v. Illinois Northern Utilities Co.,* 378 Ill. 506, 513-14.) In *Weiland Tool & Manufacturing Co.* the plaintiff sued to enforce its common law lien on the defendant's property; the defendant filed an answer and a counterclaim. The appellate court reversed a judgment in the plaintiff's favor and remanded the cause for disposition of the defendant's counterclaim. The plaintiff then filed a petition for leave to appeal with this court, which was dismissed on the ground that the judgment from which the plaintiff was seeking to appeal was not final. Thereafter the trial court entered a judgment in the defendant's favor on the counterclaim, and the judgment was affirmed by the appellate court. When the plaintiff filed a new petition for leave to appeal with this court the defendant contended that this court's dismissal of the plaintiff's first petition for leave to appeal was a judgment on the merits which barred this court's considering the plaintiff's claim. In rejecting this contention, it was said:

"The petition for leave to appeal to this court was not denied but was dismissed on Whitney's motion that the judgment appealed from lacked

finality. Dismissal was a determination only that this court lacked jurisdiction to entertain the appeal at that time. A dismissal of a cause for lack of jurisdiction does not constitute an adjudication of the substantive issues involved. (*City of Geneseo v. Illinois Northern Utilities Co.*, 378 Ill. 506.) The first judgment of the Appellate Court may have been the 'law of the case' for that court, but that does not apply to us. This is the first time the cause has been before us on the merits and our review must necessarily cover all matters properly raised and passed upon in the course of this litigation." 44 Ill. 2d 105, 113-14.

When a cause of action is dismissed by this court on the ground that the plaintiff lacks standing, it is not necessary for the court to consider the substantive issues involved. (See, *e.g., Schiller Park Colonial Inn, Inc. v. Berz*, 63 Ill. 2d 499; *Greater Chicago Indoor Tennis Clubs, Inc. v. Village of Willowbrook*, 63 Ill. 2d 400; *Edelen v. Hogsett*, 44 Ill. 2d 215.) Thus, the dismissal of the suits brought by Droste because he lacked standing did not amount to an adjudication on the merits that would bar the Attorney General's complaint for a declaratory judgment.

The defendant, calling our attention to the language in the opinion in *Droste*, argues that this court did pass upon the constitutionality of the legislative grant. However, all of the language in an opinion does not necessarily express the actual holding by the court. This court observed in *Adams v. Pearson*, 411 Ill. 431, 437: "It is well settled, however, that what has been adjudicated is to be determined not from the opinion rendered but from a consideration of the judgment actually entered in reference to the issues presented for decision. [Citations.]"

This court indicated the judgments it was entering in *Droste* in reference to the issues presented for review at pages 504 and 505 of its opinion. It was held that the

respective trial courts' dismissals of the suits were being affirmed on the ground that the plaintiff lacked standing.

"Accordingly, we conclude the trial court was correct in its determination that the Public Moneys Act did not give plaintiff standing to maintain this action.

\* \* \*

\*\*\* The amended complaint of plaintiff in this action is totally devoid of allegations which set forth such special damage. Without such allegations he has no standing to bring this suit.

\*\*\* We conclude that cause No. 38905 was properly dismissed for the failure of plaintiff to allege facts giving him standing to maintain the action." 34 Ill. 2d 495, 504-05.

At the time *Droste* was decided there had to be a constitutional question to give this court jurisdiction on direct appeal. This court declared that the constitutional question presented in *Droste* was sufficient to give the court jurisdiction to entertain the appeal. (34 Ill. 2d 495, 502.) What the court said beyond that concerning the constitutionality of Senate Bill 782 must be regarded as *dicta* and not as the holding of the court. This construction of *Droste* is consistent with related holdings of this court. For example, we recently stated in *Schiller Park Colonial Inn, Inc. v. Berz,* 63 Ill. 2d 499, 510-11, that "[t]his court will not determine the constitutionality of provisions of an act which do not affect the parties to the cause under consideration. (*Rosewood Corp. v. Fisher,* 46 Ill. 2d 249.) A party who would attack a statute as unconstitutional must bring himself within the class as to whom the law is unconstitutional. (*People v. Bombacino,* 51 Ill. 2d 17, *cert. denied,* 409 U.S. 912, 34 L. Ed. 2d 173, 93 S. Ct. 230.)" This court specifically declared in *Droste* that the taxpayer lacked standing and could not bring the action. He did not allege, the court pointed out (34 Ill. 2d 495, 504), that he would suffer special damages different

in degree and kind from damage sustained by the public at large through the operation of this statute. (This requirement was eliminated in *Paepcke v. Public Building Com.,* 46 Ill. 2d 330, 341-42.) There was, therefore, at that time, no need to pass upon the constitutionality of Senate Bill 782.

As we have observed, the burden is upon the party that is asserting that *res judicata* is applicable, and we must conclude that the defendant has not met that burden by showing there was a judgment on the merits in *Droste. Chicago Historical Society v. Paschen,* 9 Ill. 2d 378; *City of Geneseo v. Illinois Northern Utilities Co.,* 378 Ill. 506.

The defendant argues that in any event Senate Bill 782 does not violate the public trust doctrine or any of the constitutional provisions as the Attorney General alleges and that the trial court's judgment was erroneous.

Any discussion of the public trust doctrine in Illinois must begin with *Illinois Central Railroad Co. v. Illinois,* 146 U.S. 387, 36 L. Ed. 1018, 13 S. Ct. 110 (*Illinois Central I*), which has been described as "The Lodestar in American Public Trust Law." (Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich. L. Rev. 471, 489 (1970).) In 1869, the General Assembly granted to the Illinois Central Railroad all of the land lying beneath the waters of Lake Michigan between Randolph and 12th Streets in the city of Chicago for a distance of one mile eastward into the lake. In 1873 the General Assembly repealed the earlier grant. One of the questions presented in the Supreme Court was "whether the legislature was competent to thus deprive the State of its ownership of the submerged lands in the harbor of Chicago." (146 U.S. 387, 452, 36 L. Ed. 1018, 1042, 13 S. Ct. 110, 118.) (Although this cause was filed in an Illinois circuit court, it was removed to a Federal district court on the motion of Illinois Central.) The court, after stating that the State held title to the lands, said:

"But it is a title different in character from that which the State holds in lands intended for sale. *** It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and water remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the

purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." (146 U.S. 387, 452-53, 36 L. Ed. 1018, 1042, 13 S. Ct. 110. 118.)

The opinion later concluded:

"The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. The legislation which may be needed one day for the harbor may be different from the legislation that may be required at another day. Every legislature must, at the time of its existence, exercise the power of the State in the execution of the trust devolved upon it. We hold, therefore, that any attempted cession of the ownership and control of the State in and over the submerged lands in Lake Michigan, by the act of April 16, 1869, was inoperative to affect, modify or in any respect to control the sovereignty and dominion of the State over the lands, or its ownership thereof, and that any such attempted operation of the act was annulled by the repealing act of April 15, 1873, which to that extent was valid and effective. There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it." 146 U.S. 387, 460, 36 L. Ed. 1018, 1045, 13 S. Ct. 110, 121.

The next time the question of the public trust doctrine arose in Illinois was in *People ex rel. Moloney v. Kirk,* 162 Ill. 138. The General Assembly in 1889 enacted legislation to enable the commissioners of Lincoln Park to extend Lake Shore Drive from Oak to Ohio Streets in

Chicago by filling in waters of Lake Michigan and building a road over the reclaimed land. The statute authorized the commissioners to sell the submerged lands lying between the shore line as it existed in 1889 and the inner edge of the proposed extension of Lake Shore Drive. The sale was authorized to defray the costs of constructing the road. This court, citing *Illinois Central I* with approval, stated:

"It is true that the State holding the title to the lands covered by the waters of Lake Michigan does not hold such title subject to barter and sale, as does the United States its public lands; but the State holds the title in trust, in its sovereign capacity, for the people of the entire State, for the purposes of navigation and fishery. The governmental powers of the State over these lands cannot be relinquished or given away. The trust imposed upon the State must be kept and faithfully observed." (162 Ill. 138, 147.)

The court reviewed a number of decisions of the Supreme Court of the United States and stated:

"Under the authorities the law seems to be well settled that the legislature was clothed with power to enact a law authorizing the extension of the driveway over and upon the waters of the lake, so long as the extension did not interfere with navigation, commerce and the right of fishery upon the lake, and we see no reason why the submerged lands reclaimed by the extension of the driveway may not, as provided in the act, be appropriated for the payment of the improvement. *** In providing for the construction of the drive over and upon the shoal waters of the lake and placing the control in the hands of the park commissioners for park purposes, no attempt has been made by the legislature to relinquish its governmental powers or place them beyond the power of future legislation. The rights

of navigation and of fishery remain substantially in the public as before. If these rights were taken away or materially infringed upon by the act or the action of the commissioners under the act, the action of the commissioners could not be sustained, as the legislature has no power to dispose of the waters of Lake Michigan, or the lands under the waters, contrary to the trust under which they are held for the people." (162 Ill. 138, 151.)

The court went on to determine that the "main purpose of the act" was to extend Lake Shore Drive over the waters of Lake Michigan and that it was not illegal for the legislature to authorize the sale of the reclaimed land to defray the cost of the improvement. 162 Ill. 138, 155-56.

A short time later another question involving submerged lands was presented to this court. In *Illinois Central R.R. Co. v. City of Chicago,* 173 Ill. 471 (*Illinois Central II*), the plaintiff railroad sought to prevent the city of Chicago from interfering with its plan to fill in 4.48 acres of land submerged in Lake Michigan between 25th and 27th Streets in Chicago. The plaintiff proposed to construct an engine house on the reclaimed land, and it alleged in its complaint the necessity of constructing the engine house on this site. The plaintiff contended that it had the power under the charter granted to it by the State to reclaim this land. This court, citing *People ex rel. Moloney v. Kirk,* 162 Ill. 138, declared that the State held title to the submerged lands in trust for the benefit of the people and that it could not sell these lands. (173 Ill. 471, 485.) It went on to say that in *Illinois Central 1* the Supreme Court had held that "grants of parcels of lands for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which do not impair the public interests in the lands and waters remaining" could be allowed. (173 Ill. 471, 485.) But the court concluded:

"It is not proposed, here, to take or appropri-

ate the land in question for the erection of wharves, docks or piers, the construction of which may facilitate or aid the navigation of the waters of the lake, but the sole purpose seems to be to appropriate the submerged land for the private use of the railroad company. It is unreasonable to believe that the legislature, in the enactment of section 3 of the charter of the railroad company, ever intended to place in the hands of the company unlimited power to go on, from time to time, and appropriate to its own use parcel after parcel of the lands covered by the waters of Lake Michigan, and if such unlimited power was contemplated it transcended its authority. It, in effect, undertook to part with governmental powers, which it could not do." 173 Ill. 471, 487.

It can be seen that the State holds title to submerged land, as is involved here, in trust for the people, and that in general the governmental powers over these lands will not be relinquished. (See generally R. Clark, Waters and Water Rights sec. 36.4(A) (1967); R. Powell, The Law of Real Property, par. 160.) It is within this general framework that we are called upon to decide whether the legislative grant here was valid. In two of the discussed decisions (*Illinois Central I* and *II*) direct grants of submerged lands to private interests were held void. In the one case (*People ex rel. Moloney v. Kirk*) in which a grant of private interests was upheld, it was observed that the main purpose of the statute was to allow public officials to construct a needed extension of Lake Shore Drive for direct public benefit. (162 Ill. 138, 155-56.) In none of these cases, nor in later cases decided by this court (*Fairbank v. Stratton,* 14 Ill. 2d 307; *Bowes v. City of Chicago,* 3 Ill. 2d 175), was a grant upheld where its primary purpose was to benefit a private interest.

Courts in general (see, *e.g., Marks v. Whitney* (1971),

6 Cal. 3d 251, 491 P.2d 374, 98 Cal. Rptr. 790; *Obrecht v. National Gypsum Co.* (1960), 361 Mich. 399, 105 N.W.2d 143; *Treuting v. Bridge and Park Com.* (Miss. 1967), 199 So. 2d 627; *Borough of Neptune City v. Borough of Avon-By-The-Sea* (1972), 61 N.J. 296, 294 A.2d 47; *City of Madison v. State* (1957), 1 Wis. 2d 252, 83 N.W.2d 674; *State v. Public Service Com.* (1957), 275 Wis. 112, 81 N.W.2d 71) have shown great circumspection in considering grants of this character. This posture of caution has been described by Professor Sax in *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich. L. Rev. 471, 490 (1970):

> "When a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon *any* governmental conduct which is calculated *either* to reallocate that resource to more restricted uses *or* to subject public uses to the self-interest of private parties."

And it may be pointed out that, in considering what is the public interest, courts are not bound by inflexible standards.

> "We have no difficulty in finding that, in this latter half of the twentieth century, the public rights in tidal lands are not limited to the ancient prerogatives of navigation and fishing, but extend as well to recreational uses, including bathing, swimming and other shore activities. The public trust doctrine, like all common law principles, should not be considered fixed or static, but should be molded and extended to meet changing conditions and needs of the public it was created to benefit." *Borough of Neptune City v. Borough of Avon-By-The-Sea* (1972), 61 N.J. 296, 309, 294 A.2d 47, 54-55, and cases and authorities cited therein; see also *Marks v. Whitney* (1971), 6 Cal. 3d 251, 491 P.2d 374, 98 Cal. Rptr. 790.

On this question of changing conditions and public

needs, it is appropriate to observe that there has developed a strong, though belated, interest in conserving natural resources and in protecting and improving our physical environment. The public has become increasingly concerned with dangers to health and life from environmental sources and more sensitive to the value and, frequently, the irreplaceability of natural resources. This is reflected in the enactment of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1001 *et seq.*) in 1971 and in the ratification by the people of this State of sections 1 and 2 of article XI of the 1970 Constitution, which declare:

> "The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy."

> "Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law."

It is obvious that Lake Michigan is a valuable natural resource belonging to the people of this State in perpetuity (see Ill. Rev. Stat. 1975, ch. 19, pars. 71-73, 76; see also Ill. Rev. Stat. 1975, ch. 19, pars. 150-51), and any attempted ceding of a portion of it in favor of a private interest has to withstand a most critical examination.

The defendant steel company plans to construct an additional facility which will extend its South Work's Plant some 194 acres into Lake Michigan. The general area in question is bordered on the north by a public beach, Rainbow Park, at 79th Street; on the south by the United States Government breakwater protecting Calumet Harbor, and on the east by the Illinois-Indiana state line in Lake Michigan. These waters, which are adjacent to waters presently in important public use, would be irretrievably removed from the use of the people of Illinois. It cannot

be said there will not be an adverse effect on the public use of these adjacent waters. We would also observe that in *Illinois Central II* it was said of the grant there: "[T]he sole purpose seems to be to appropriate the submerged land for the private use of the railroad company." (173 Ill. 471, 487.) Here, too, we can perceive only a private purpose for the grant.

The defendant contends that the General Assembly has determined that the land in question will be used for a public purpose and that this court should not overturn this determination. The defendant points to section 1 of Senate Bill 782, which states:

> "It is hereby declared that the grant of submerged land contained in this Act is made in aid of commerce and will create no impairment of the public interest in the lands and waters remaining, but will instead result in the conversion of otherwise useless and unproductive submerged land into an important commercial development to the benefit of the people of the State of Illinois."

The defendant argues, too, that a public purpose will be served in that the plant facilities which will be erected on the reclaimed land will provide a large number of jobs and will boost the economy of the city of Chicago and of the State. We judge these arguments to be unpersuasive.

While the courts certainly should consider the General Assembly's declaration that given legislation is to serve a described purpose, this court recognized in *People ex rel. City of Salem v. McMackin,* 53 Ill. 2d 347, 354, that the "self-serving recitation of a public purpose within a legislative enactment is not conclusive of the existence of such purpose."

In order to preserve meaning and vitality in the public trust doctrine, when a grant of submerged land beneath waters of Lake Michigan is proposed under the circumstances here, the public purpose to be served cannot be only incidental and remote. The claimed benefit here to the public through additional employment and economic improvement is too indirect, intangible and elusive to

satisfy the requirement of a public purpose. In almost every instance where submerged land would be reclaimed there would be employment provided and some economic benefit to the State. This court has upheld grants where the land was to be used for a water filtration plant (*Bowes v. City of Chicago,* 3 Ill. 2d 175) and for an exposition hall (*Fairbank v. Stratton,* 14 Ill. 2d 307), but it has upheld a grant to private individuals in only one instance, *People ex rel. Moloney v. Kirk,* 162 Ill. 138. There, however, as has been pointed out, the main purpose of the legislation was to benefit the public by the construction of an extension of Lake Shore Drive. The benefit to private interest was to further a public purpose and was incidental to the public purpose. (See also *City of Milwaukee v. State* (1927), 193 Wis. 423, 214 N.W. 820.) Any benefit here to the public would be incidental. We judge that the direct and dominating purpose here would be a private one.

For the reasons given, the judgment of the circuit court is affirmed.

*Judgment affirmed.*

MR. JUSTICE UNDERWOOD, dissenting:

My disagreement with the majority of my colleagues does not stem from a belief that, measured by the standards of today's enhanced public concern with the conservation of natural resources and their preservation for public use, the legislation authorizing conveyance of this submerged land is desirable. Rather, my expression of disagreement is prompted by my belief that the question of the validity of Senate Bill 782 is not now open to consideration.

More than 10 years ago the then Governor, Secretary of State and Attorney General opposed a taxpayer's suit and urged this court to affirm a trial court judgment which held Senate Bill 782 valid. This court did so. (*Droste v. Kerner* (1966), 34 Ill. 2d 495.) The ordinary *res judicata* effect of that decision is said not to operate here because

that portion of the opinion dealing with the validity of Senate Bill 782 was *dicta,* and the present court is therefore free to reexamine that question in the light of today's standards which militate considerably more strongly against validity. I would concede that the reasons for applying the doctrine of *res judicata* here may be somewhat less compelling in that the object of Senate Bill 782—the conveyance of the submerged land to United States Steel—has not occurred and, for that matter, may never occur since the conveyance to United States Steel was conditioned upon reconveyance by the Chicago Park District to the State of the District's interest in this land, and the Park District has not reconveyed. (In fact, the District's trial court position in the present litigation, in addition to asserting the Attorney General had no standing to bring this action, was that the State was attempting to convey lands which the District owned.) But the *Droste* court passed on the validity of Senate Bill 782, since it was only the question whether that legislation violated the Constitution which supported this court's appellate jurisdiction. While, in view of the fact that no conveyance has occurred, perhaps no substantial changes of position have been made in reliance thereon, I do not view the uncompleted conveyance as justification for what seems to me to be a disregard for the finality and stability of judicial decisions. We simply do not know, for example, whether alternatives which might have been successfully pursued 10 years ago are now available to the prospective purchaser. And, it is also apparent from this record that numerous other conveyances of State-owned lands, including submerged Lake Michigan land, have been made in years past to private grantees, among them other steel companies. While the doctrine of *laches* probably bars a current challenge to the validity of the legislation authorizing those conveyances, it is unsettling to think that, if a way could be found to question their validity, they would be scrutinized in the light of present-day concerns.

I concur with the court's statements regarding the desirability and efficacy of the public trust doctrine. Measured by the standards that existed when *Droste* was decided, however, I could not then and cannot now conclude the legislation violated this doctrine. The South Work's Plant was and is a major employer with a multi-million-dollar payroll and of undeniable benefit to the Chicago and Illinois economies. Nearly a century old, yet the largest steel-producing plant in Illinois, there was shown to be some doubt whether the plant could remain competitive without significant expansion. Affidavits of reputable experts disagreed concerning the feasibility of landward expansion onto noncontiguous sites.

Experts also disagreed whether the proposed industrial development of this presently submerged parcel was compatible with existing and anticipated surrounding land uses. There is little, if any, dispute that, because of the existence of the United States government breakwater to the south of the parcel, the proposed development would not disrupt navigation into Calumet Harbor. Rather, the principal controversy concerns recreational opportunities to which the submerged land area might be put. It is clear, however, that the area immediately south of 79th street is zoned for industrial use. It is also clear the only land access to the submerged property, when filled, would be across the present South Work's site. Despite this, some of plaintiffs' experts suggested that the highest and best use of the parcel is recreational, as an adjunct to Rainbow Park to the north. Other experts worried that the development would be environmentally or ecologically harmful. However, the proposed reclamation must meet strict permit requirements of the United States Army Corps of Engineers, and further development would have to comply with all pertinent zoning and pollution requirements of Federal, State and local agencies, safeguards which would seem sufficient public protection.

I am also satisfied that the cost to United States Steel

of this parcel is not, as in the opinion of one affiant, "patently preposterous." Estimates of the cost to merely bulkhead and fill the site ranged from $107,000 to $162,000 per acre. The estimated assessed valuation in 1975 of the resulting property, filled and appropriately zoned, ranged from $28,300 to $180,000 per acre. And these estimates apparently included no reference to any expenditures which might be required to secure from the Park District a conveyance of its claimed interest in the site.

One of plaintiffs' experts, at the end of a lengthy affidavit filed in 1975, concluded:

> "Although one cannot dispute that the State of Illinois has a valid interest and role in aiding commerce in general, and possibly the United States Steel Corporation South Works in particular, the questions of whether the proposed action would 'create no impairment of the public interest' and whether the 194.6 acre site is otherwise 'useless and unproductive' are not clearly settled." (Affidavit of Robert B. Teska, at 22.)

I agree these questions were not, are not and may never be "clearly settled." The General Assembly considered those questions in 1963, however, and concluded that, on balance, the conveyance was in the public interest. I could not say in 1966, and cannot now say, that determination was clearly erroneous.

RYAN and CREBS, JJ., join in this dissent.